MIDLAND NATIONAL LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5939-73, 10081-74.     Filed June 22, 1976.

*Alan L. Austin,* for the petitioner.
*Robert F. Cunningham,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income tax in these consolidated cases:

| Docket No. | Year | Deficiency |
|---|---|---|
| 5939-73 | 1965 | $295,315.06 |
| 10081-74 | 1969 | 14,326.00 |

Other issues having been the subject of concessions by the parties, the following remain for our resolution:

(1) Whether, for purposes of section 805(b)(4)[1] and for certain purposes in computing gain or loss from operations, petitioner must include in its "assets" any portion of deferred and uncollected premiums;

(2) Whether petitioner must include deferred and uncollected premiums in the "gross amount of premiums" under section 809(c)(1), and if so,

(3) Whether, in determining gain or loss from operations, petitioner is entitled to a deduction under section 809(d)(12) in the amount of the increase in loading and costs of collection in excess of loading on deferred and uncollected premiums, or alternatively,

(4) Whether petitioner is entitled to a deduction under section 809(d)(12) for accrued commissions and accrued premium taxes attributable to deferred and uncollected premiums.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

FINDINGS OF FACT

Midland National Life Insurance Co. (hereinafter referred to as Midland or petitioner) qualifies as a life insurance company within the meaning of section 801(a). At the time it filed its amended petitions, Midland's principal office was in Watertown, S.Dak. Midland filed Federal income tax returns for the taxable years 1958 through 1969 with the District Director of Internal Revenue, Aberdeen, S.Dak., and kept its books and records using the accrual method of accounting.

Petitioner's life, health, and accident insurance operations and accounts were subject to the supervision and approval of the commissioner of insurance for the State of South Dakota (hereinafter the commissioner of insurance). Because it does business in numerous States, petitioner is subject to periodic audit of its accounts by the National Association of Insurance Commissioners (the NAIC), which acts on behalf of the insurance departments of the various States.

The NAIC is a voluntary organization composed of officials of various States charged with the supervision of insurance companies and their operations. It has adopted a uniform annual statement form for use by life insurance companies in filing their annual accounting statements with the various State insurance commissioners, including South Dakota's commissioner of insurance. Midland prepared and filed its annual statements for the years 1958 through 1969 with the commissioner of insurance and in each of the States in which it was licensed to conduct an insurance business, in accordance with instructions furnished by the respective insurance commissioners for completing annual statements on forms approved by the NAIC.

Certain terms commonly employed by the life insurance industry and used on the NAIC annual statement form are defined as follows:

(1) *Gross premium.*—Gross premium is the contract price or amount actually charged to the insured to keep the contract in force, which amount may be paid in any of the four common modes of collection, e.g., annual, semiannual, quarterly, and monthly. In the development of a gross premium calculation for nonparticipating insurance (plans under which the insured does not participate in the earnings of the company), the actuary takes into account realistic assumptions for mortality and interest rates

(as opposed to conservative assumptions required by State law for reserve computations). The actuary uses actual expenses and termination rates or estimates which he would expect the insurance company to experience and then includes a margin for profit and other contingencies.

(2) *Net tabular valuation premium.*—Net tabular valuation premium is the amount which it is estimated, using the applicable mortality tables and interest assumptions for the policy, will be required to pay claims and provide. the benefits of the policy. The tables and interest assumptions are established by State law and are generally conservative estimates. The portion which is required by State law to be held as a reserve is based upon the net tabular valuation premium. This is often referred to as the net premium.

(3) *Loading.*—Loading is the difference obtained by subtracting the net tabular premium from the gross premium.[2] There is no direct relationship between loading and any expenses incurred, or profit margin or contingency estimates made, by the company. For nonparticipating insurance policies, the net premium and the gross premium are computed independently, although the net premium is considered in determining an acceptable gross premium. The net premium is computed utilizing the conservative mortality and interest assumptions established by State law, and the gross premium is computed using realistic assumptions based upon company experience. Thus, the net premium may exceed the gross premium, in which case deficiency reserves are necessary to comply with State regulatory requirements.

(4) *Deferred premium.*—Deferred premium is that portion of the gross contract premium on policies with premiums payable more often than annually, which becomes due after December 31 of the calendar year and before the next policy anniversary date. For example, if the anniversary date of a policy is April 1 and the premiums are payable monthly, as of December 31 the subsequent January, February, and March payments constitute deferred premiums.

---

[2] "Loading," in this sense, is a technical term of art in the industry. The term is also often used to describe the process of adding to the net premium an amount necessary to cover operating and administrative expenses, contingencies, and profits. Such "administrative loading" is different from the more formal, technical "loading," defined in the text.

(5) *Uncollected premium.*—An uncollected premium is an annual or installment premium which, as of December 31 of a calendar year, has become due but has not as yet been paid.

(6) *Loading on deferred premium.*—Loading on deferred premium is the difference between the deferred gross premium and the deferred net premium.

The NAIC requires an annual accounting statement as of each calendar year. Midland was required by the commissioner of insurance and by the NAIC to compute its reserves on its life insurance policies on the assumption that on each policy anniversary date the full annual gross contract premium had been received, even though such premium was not necessarily paid in this manner. These reserves were reflected as a liability on Midland's statements and were also taken into account by petitioner in the computations required to file its income tax returns for 1958 through 1969.

The concept of deferred and uncollected premiums is a direct consequence of the above assumption required for preparation of the annual statements. That is, deferred premiums are those premiums deemed to have been paid for the NAIC statement purposes but which the company has not actually received.

The insured has no obligation, legal or otherwise, to pay the insurer deferred and uncollected premiums. If the insured does not pay the premiums in conformity with the provisions of the policy, the policy will lapse after the grace period or convert to a nonforfeiture option; nor does the company (insurer) have a legal right to collect the deferred and uncollected portion of the gross contract premium from the insured. Midland typically employs a grace period of 31 days on all insurance policies in force.

On its Federal income tax returns for the years 1958 through 1962, Midland claimed a deduction for "Increase in Loading, etc.," taken from its annual statement for each of those years. In the course of the audits of petitioner's Federal income tax returns for said years, the examining agent disallowed the deduction claimed for "Increase in Loading, etc." On its 1963 and subsequent years' returns through the year 1969, petitioner did not claim a deduction for "Increase in Loading, etc."

The gross deferred and uncollected premiums included in petitioner's annual statements as yearend balances for the years 1957 through 1969 are as follows:

| Year | First year | Renewal | Total |
|------|-----------|---------|-------|
| 1957 | $167,827.05 | $618,971.09 | $786,798.14 |
| 1958 | 292,443.77 | 769,632.84 | 1,062,076.61 |
| 1959 | 232,759.92 | 826,777.00 | 1,059,536.92 |
| 1960 | 227,339.88 | 960,434.57 | 1,187,774.45 |
| 1961 | 223,885.81 | 1,144,522.24 | 1,368,408.05 |
| 1962 | 326.645.30 | 1,174,397.34 | 1,501,042.64 |
| 1963 | 443,109.39 | 1,355,509.90 | 1,798,619.29 |
| 1964 | 515,051.26 | 1,573,517.80 | 2,088,569.06 |
| 1965 | 528,722.00 | 1,778,209.67 | 2,306,931.67 |
| 1966 | 568,624.53 | 2,025,333.24 | 2,593,957.77 |
| 1967 | 593,435.41 | 2,360,822.00 | 2,954,257.41 |
| 1968 | 561,635.05 | 2,484,685.02 | 3,046,320.07 |
| 1969 | 762,117.49 | 2,550,719.77 | 3,312,837.26 |

Petitioner included as premium income on its tax returns for the years 1958 through 1969 and in its annual statements for said years the increase in deferred and uncollected premiums, above, as follows:

| Year | First year | Renewal | Total |
|------|-----------|---------|-------|
| 1958 | $124,616.72 | $150,661.75 | $275,278.47 |
| 1959 | (59,683.85) | 57,144.16 | (2,539.69) |
| 1960 | (5,420.04) | 133,657.57 | 128,237.53 |
| 1961 | (3,454.07) | 184,087.67 | 180,633.60 |
| 1962 | 102,759.49 | 29,875.10 | 132,634.59 |
| 1963 | 116,464.09 | 181,112.56 | 297,576.65 |
| 1964 | 71,941.87 | 218,007.90 | 289,949.77 |
| 1965 | 13,670.74 | 204,691.87 | 218,362.61 |
| 1966 | 39,902.53 | 247,123.57 | 287,026.10 |
| 1967 | 24,810.88 | 335,488.76 | 360,299.64 |
| 1968 | (31,800.36) | 123,863.02 | 92,062.66 |
| 1969 | 200,482.44 | 66,034.75 | 266,517.19 |

The amount of yearend loading on gross deferred and uncollected premiums reported by petitioner in its annual statements for the years 1957 through 1969 is as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1957 | $126,297.08 | 1964 | $502,191.20 |
| 1958 | 228,475.64 | 1965 | 549,458.49 |
| 1959 | 177,452.68 | 1966 | 652,520.67 |
| 1960 | 203,890.25 | 1967 | 778,280.17 |
| 1961 | 263,323.46 | 1968 | 755,619.65 |
| 1962 | 306,363.25 | 1969 | 867,638.29 |
| 1963 | 453,214.50 | | |

The increase in loading (the difference between the loading at yearend and the loading at the beginning of the year), as reflected

in Midland's annual statements for the years 1958 through 1969, is as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1958 | $102,178.56 | 1964 | $48,976.70 |
| 1959 | (51,022.96) | 1965 | 47,267.29 |
| 1960 | 26,437.57 | 1966 | 103,062.18 |
| 1961 | 59,433.21 | 1967 | 125,759.50 |
| 1962 | 43,039.79 | 1968 | (22,660.52) |
| 1963 | 146,851.25 | 1969 | 112,018.64 |

The amount of yearend cost of collections in excess of loading on gross deferred and uncollected premiums reported by petitioner in its annual statements for the years 1960 through 1969 is as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1960 | $68,864.87 | 1965 | $107,695.43 |
| 1961 | 68,068.49 | 1966 | 83,480.03 |
| 1962 | 128,799.57 | 1967 | 19,719.14 |
| 1963 | 149,824.62 | 1968 | 30,755.40 |
| 1964 | 141,412.03 | 1969 | 118,059.10 |

The increase in cost of collections (the difference between the cost of collections at yearend and cost of collections at the beginning of the year), as reflected in Midland's annual statements for the years 1960 through 1969, is as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1960 | $68,864.87 | 1965 | ($33,716.60) |
| 1961 | (796.38) | 1966 | (24,215.40) |
| 1962 | 60,731.08 | 1967 | (63,760.89) |
| 1963 | 21,025.05 | 1968 | 11,036.26 |
| 1964 | (8,412.59) | 1969 | 87,303.70 |

Petitioner's collected premiums for the years 1957 through 1969, as reflected in its annual statements, are as follows:

| Year | First Year | Renewal | Total |
|------|-----------|---------|-------|
| 1957 | $755,954.91 | $2,613,639.27 | $3,369,594.18 |
| 1958 | 690,283.17 | 2,913,396.32 | 3,603,679.49 |
| 1959 | 854,211.21 | 3,239,560.40 | 4,093,771.61 |
| 1960 | 859,884.00 | 3,463,022.35 | [1] 4,332,906.35 |
| 1961 | 878,673.45 | 3,857,464.21 | 4,736,137.66 |
| 1962 | 909,341.29 | 4,182,838.70 | 5,092,179.99 |
| 1963 | 1,219,849.34 | 4,472,805.90 | [1] 5,692,655.29 |
| 1964 | 1,371,377.56 | 4,980,314.76 | 6,351,692.32 |
| 1965 | 1,515,381.29 | 5,534,931.20 | 7,050,312.49 |
| 1966 | 1,476,797.03 | 6,015,794.87 | 7,492,591.90 |

| Year | First Year | Renewal | Total |
|------|-----------|---------|-------|
| 1967 | 1,694,262.16 | 6,431,036.67 | 8,125,298.83 |
| 1968 | 1,664,623.41 | 7,098,823.77 | 8,763,447.18 |
| 1969 | 1,803,901.81 | 7,714,699.60 | 9,518,601.41 |

[1] The total stipulated to by the parties is inaccurate, apparently due to mathematical errors. The necessary adjustments will be made in the Rule 155 computations.

Upon receipt of premiums, Midland is required by its contractual relationships with its agents (solicitors) to pay commissions and production bonuses and further is required by law to pay premium taxes on such collected premiums to the various States in which it is licensed to do business. Allowances for commissions to intermediate agents under a general agent, such as a district agent, are treated as a reduction (deduction) from the commissions allowed to the general agent.

Midland paid commissions and production bonuses in the years 1957 through 1969, as shown in its books and records (trial balance), for premiums—first year and renewals—collected during such years as follows:

| Year | First year | Renewal | Total |
|------|-----------|---------|-------|
| 1957 | $658,496.09 | $164,669.16 | $823,165.25 |
| 1958 | 543,097.55 | 335,272.76 | [1]869,370.31 |
| 1959 | 880,043.52 | 250,963.05 | 1,131,006.57 |
| 1960 | 865,340.16 | 289,775.38 | 1,155,115.54 |
| 1961 | 850,671.42 | 300,753.95 | 1,151,425.37 |
| 1962 | 948,029.33 | 305,830.35 | 1,253,859.68 |
| 1963 | 1,302,682.69 | 273,473.02 | [1]1,576,155.91 |
| 1964 | 1,467,159.55 | 302,681.05 | 1,769,840.60 |
| 1965 | 1,563,512.52 | 335,485.69 | 1,898,998.21 |
| 1966 | 1,536,869.90 | 376,050.86 | 1,912,920.76 |
| 1967 | 1,747,051.59 | 410,479.01 | 2,157,530.60 |
| 1968 | 1,752,600.01 | 461,179.55 | 2,213,779.56 |
| 1969 | 1,895,612.89 | 477,911.67 | 2,373,524.56 |

[1] The total stipulated to by the parties is inaccurate, apparently due to mathematical errors. The necessary adjustments will be made in the Rule 155 computations.

Petitioner incurred premium taxes during the years 1957 through 1969 on life and annuity gross premiums collected during said years. The amounts of incurred premium taxes and collected premiums for those years are as follows:

| Year | Incurred premium taxes | Collected premium |
|---|---|---|
| 1957 | $55,315.83 | $3,408,899.15 |
| 1958 | 60,675.51 | 3,793,779.79 |
| 1959 | 65,996.09 | 4,311,128.37 |
| 1960 | 68,729.32 | 4,560,410.05 |
| 1961 | 75,086.31 | 4,907,964.99 |
| 1962 | 92,556.26 | 5,254,782.41 |
| 1963 | 109,171.76 | 5,915,665.21 |
| 1964 | 106,180.73 | 6,713,486.83 |
| 1965 | 134,773.65 | 7,634,117.24 |
| 1966 | 145,553.06 | 8,262,099.71 |
| 1967 | 165,958.06 | 9,434,620.99 |
| 1968 | 174,788.01 | 10,356,678.01 |
| 1969 | 209,580.39 | 10,754,836.03 |

Midland computed[3] the following increases in accrued commissions on deferred and uncollected premiums for the years 1958 through 1969 for which it claims deductions in those years:

| Year | Increase in accrued commissions | Year | Increase in accrued commissions |
|---|---|---|---|
| 1958 | $129,658.82 | 1964 | $90,588.45 |
| 1959 | (10,995.80) | 1965 | 6,630.65 |
| 1960 | 5,303.66 | 1966 | 65,068.26 |
| 1961 | (3,163.68) | 1967 | 44,258.37 |
| 1962 | 120,427.02 | 1968 | (9,870.68) |
| 1963 | 129,656.41 | 1969 | 206,133.18 |

Midland also computed[4] the following increases in accrued premium taxes on deferred and uncollected premiums for1958 through 1969 for which it claims deductions in those years:

| Year | Increase in accrued premium tax | Year | Increase in accrued premium tax |
|---|---|---|---|
| 1958 | $4,247.10 | 1964 | ($275.07) |
| 1959 | (782.32) | 1965 | 7,833.30 |
| 1960 | 1,724.48 | 1966 | 4,820.97 |
| 1961 | 3,001.25 | 1967 | 6,341.27 |
| 1962 | 5,481.71 | 1968 | (512.12) |
| 1963 | 6,856.11 | 1969 | 13,117.52 |

---

[3] The computations were made by ascertaining the ratio of commissions paid and production bonuses to collected premiums and then applying that ratio, expressed as a percentage, to gross deferred and uncollected premiums. The same method was utilized for estimation of accrued premium taxes.

[4] See n. 3 *supra*.

OPINION

The system devised for the taxation of income earned by life insurance companies is prescribed in sections 801 through 820. The workings of this complex system have been the subject of detailed analysis in several prior opinions. See, e.g., *Jefferson Standard Life Insurance Co. v. United States*, 408 F.2d 842, 844-846 (4th Cir. 1969), cert. denied 396 U.S. 828 (1969); *Franklin Life Insurance Co. v. United States*, 399 F.2d 757, 758-760 (7th Cir. 1968), cert. denied 393 U.S. 1118 (1969); *Bankers Union Life Insurance Co.*, 62 T.C. 661 (1974). Briefly, the Internal Revenue Code purports to tax only the portion of investment and premium income that represents the life insurance company's profit which is available legally for distribution to shareholders or policyholders. To this end the amount of tax is computed pursuant to a three-phase formula. In the instant case we are concerned with only phases I and II.

Phase I, outlined in sections 804 and 805, involves a division of the investment income ("investment yield," sec. 804(c)) between the taxable amount allocable to the company and the nontaxable amount allocable to the policyholder reserves. Phase II, contained in sections 809 through 812, requires consideration of "gain or loss from operations" as well as "the life insurance company's share of each and every item of investment yield" (sec. 809(b)(1)(A)).

For the purposes of both phases I and II, a series of computations is required in order to divide the investment income between the company's taxable share and the nontaxable share attributable to policyholders' reserves. In essence, the policyholders' reserve share is determined by applying to each item of investment yield a fraction which is derived from the relationship between three items: the life insurance reserves, as defined in section 801(b), the assets of the company, as defined in section 805(b)(4),[5] and the total investment yield.[6] Under the

---

[5] SEC. 805. POLICY AND OTHER CONTRACT LIABILITY REQUIREMENTS.
(b) ADJUSTED RESERVES RATE AND EARNINGS RATES.—
* * *
(4) ASSETS.—For purposes of this part, the term "assets" means all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business. For purposes of this paragraph, the amount attributable to—
(A) real property and stock shall be the fair market value thereof, and
(B) any other asset shall be the adjusted basis (determined without regard to fair market value on December 31, 1958) of such asset for purposes of determining gain on sale or other disposition.
[6] Stated in more detail, the computations begin with a division of the company's investment yield by the company's assets in order to obtain an earnings rate (sec. 805(b)(2)

statutory formula the amount of the investment income taxable to the company decreases if the life insurance reserve is increased or if the size of the asset figure is decreased.

In section 809(b), gain from operations—an important element in the phase II computation—is defined to include, among other items, "the life insurance company's share of each and every item of investment yield." It also includes, under section 809(c), "the gross amount of premiums" in respect of insurance policies. Section 1.809-4(a)(1)(i),[7] Income tax Regs., states that the term "gross amount of all premiums" inclues "premiums deferred and uncollected." In computing gain from operations, there are allowed as deductions, subject to certain modifications, "all other deductions allowed * * * for purposes of computing taxable income to the extent not allowed as deductions in computing investment yield," sec. 809(d)(12). The result is the gain or loss from operations—the phase II tax base.

The controversy in this case stems from the fact that premiums on insurance policies are frequently paid at intervals over the policy year or during the grace period following the close

---

and (3)). This earnings rate is then multiplied by the company's adjusted life insurance reserves, and the product is the exclusion attributable to the life insurance reserves. To this product are added exclusions similarly computed for pension plan reserves and certain interest payments. The total figure represents the "policy and other contract liability requirements" (sec. 805(a)). The ratio of the "policy and other contract liability requirements" to the total investment yield is the ratio to be used in dividing each item of investment yield between the nontaxable share attributable to policyholders' reserves and the company's taxable share. *Jefferson Standard Life Insurance Co. v. United States,* 408 F.2d 842, 844-845 (4th Cir. 1969), cert. denied 396 U.S. 828 (1969)

[7] Sec. 1.809-4 Gross amount.

(a) *Items taken into account.* * * *

(1) *Premiums.* (i) The gross amount of all premiums and other consideration on insurance and annuity contracts (including contracts supplementary thereto); less return premiums, and premiums and other consideration arising out of reinsurance ceded. The term "gross amount of all premiums" means the premiums and other consideration provided in the insurance or annuity contract. Thus, the amount to be taken into account shall be the total of the premiums and other consideration provided in the insurance or annuity contract without any deduction for commissions, return premiums, reinsurance, dividends to policyholders, dividends left on deposit with the company, discounts on premiums paid in advance, interest applied in reduction of premiums (whether or not required to be credited in reduction of premiums under the terms of the contract), or any other item of similar nature. Such term includes advance premiums, premiums deferred and uncollected and premiums due and unpaid, deposits, fees, assessments, and consideration in respect of assuming liabilities under contracts not issued by the taxpayer (such as a payment or transfer of property in an assumption reinsurance transaction as defined in paragraph (a)(7)(ii) of §1.809-5). * * *

of the policy year, and the policy year rarely coincides with the insurance company's taxable year. The result is that portions of these policy premiums are "deferred and uncollected" at the end of its taxable year. Yet the insurance company is required by State law to assume that the gross premiums due under the policies are received during the taxable year and to add to its reserves sums, called "net valuation premiums," sufficient to cover its liabilities under these policies. The difference between the gross premiums and the net valuation premiums is referred to as "loading."

The first three issues for decision are all related: whether any portion of deferred and uncollected premiums is includable in "assets" in phase I computations of the company's share of investment income (sec. 805(b)(4)) or in "gross amount of premiums" in phase II (sec. 809(c)(1)), and whether a deduction is allowable in phase II in respect of loading and estimated costs of collection in excess of loading on deferred and uncollected premiums (sec. 809(d)(12)).

Petitioner contends that, in computing the taxable share of its investment yield for both phases I and II purposes and its gain from operations for phase II purposes, it is entitled to exclude deferred and uncollected premiums—as an asset (sec. 805(b)(4)) and as premium income (sec. 809(c)(1)). Alternatively, petitioner contends that, in such computations, the amount of deferred and uncollected premiums should be reduced by the loading portion of those premiums. As a second alternative, if neither of the first two positions is accepted, petitioner claims a deduction for each year for the annual increase in loading and costs of collection in excess of loading on deferred and uncollected premiums in determining gain from operations.

Several Courts of Appeals have held that the term "assets" includes *gross* deferred and uncollected premiums (without any diminution for loading) for the purposes of both phase I and phase II, and that gross deferred premiums are included as gain from operations in phase II. See *Franklin Life Insurance Co. v. United States,* 399 F.2d 757, 760-761 (7th Cir. 1968), cert. denied 393 U.S. 1118 (1969); *Jefferson Standard Life Insurance Co. v. United States,* 408 F.2d 842, 854-856 (4th Cir. 1969), cert. denied 396 U.S. 828 (1969); *Western National Life Insurance Co. of Texas v. Commissioner,* 432 F.2d 298, 302 (5th Cir. 1970), revg. and remanding 51 T.C. 824 (1969), modifying 50 T.C. 285

(1968) (gross deferred and uncollected premiums are assets for purposes of phase I); *Western & Southern Life Insurance Co. v. Commissioner,* 460 F.2d 8 (6th Cir. 1972), revg. and remanding 55 T.C. 1036 (1971), cert. denied 409 U.S. 1063 (1972) (amount of loading not deductible for purposes of phases I and II); *Great Commonwealth Life Insurance Co. v. United States,* 491 F.2d 109, 112-113 (5th Cir. 1974) (gross deferred and uncollected premiums are income for purposes of phase II).

As to petitioner's claim to a deduction for loading in computing the gain from operations for the purposes of phase II, the Court of Appeals in *Franklin Life Insurance Co. v. United States, supra* at 760, said:

> Section 809(c)(1) specifically requires the inclusion of "the gross amount of premiums" for the purpose of determining "gain from operations" as defined in Section 809(b)(1). Taxpayer concedes that the intent and purpose of the Act [Life Insurance Company Income Tax Act of 1959] require that the deferred and uncollected premiums be included in income on a gross basis (which includes loading). In our view that concession leaves no basis for further controversy. This is especially so in view of the fact that Congress has provided twelve specific deductions in Section 809 but makes no provision for an offset or deduction for "increase in loading." And, the burden is on the taxpayer to show the express statutory authority for a deduction claimed. [Citation omitted.]

See also *Western & Southern Life Insurance Co. v. Commissioner,* 460 F.2d at 13.

In the light of these opinions, this court has receded from its initial position and has concluded that:

> [A life insurance company] must include in its assets for purposes of computing the phase I tax, and in its gross premiums for purposes of computing its phase II tax, the gross amount of its deferred and uncollected premiums, including loading, and that it is not entitled to a deduction with regard to loading in computing its phase II tax. [Fn. ref. omitted.]

*Bankers Union Life Insurance Co.,* 62 T.C. at 675. We adhere to that holding in this case.[8] Contra *Standard Life & Acc. Ins. Co. v.*

---

[8] The Court of Appeals for the Eighth Circuit, to which the instant case is subject to appeal, has yet to decide these issues but in *North American Life & Casualty Co. v. Commissioner* (8th Cir., 1976, 37 AFTR 2d 76-1288, 76-1291, 76-1 USTC par. 9365), affg. 63 T.C. 364 (1974), discussed in the text, *infra,* indicated its agreement with our conclusion as follows:

"The difficulty commences with the fiction that gross annual premiums are accrued as though paid on the anniversary date even though much of the premium is deferred and unreceived and is not even legally collectible by the insurance company. It would be simpler merely to refrain from accruing any portion of deferred premiums in income, along with any attributable expenses and charges, as was authorized by the Tenth Circuit in Standard Life and Accident Insurance Co. v. Commissioner, supra [*Standard Life & Acc.*

*Commissioner,* 525 F.2d 786 (10th Cir. 1975), revg. in part and affg. in part a Memorandum Opinion of this Court; *Bankers Life Co. v. United States* (S.D. Iowa 1976, 37 AFTR 2d 76-1458, 76-1 USTC par. 9419).[9]

The fourth issue is whether petitioner may deduct, under section 809(d)(12), the accrued commissions and premium taxes on the deferred and uncollected premiums. Respondent asserts that the deduction is not permissible for two reasons: (1) The expenses are not properly accruable under section 461 since liability for the commissions and premium taxes is subject to the contingency of collection of the deferred and uncollected premiums to which petitioner has no legally enforceable right; and (2) such expenses are merely a part of loading for which a deduction has been held not allowable by several courts. See, e.g., *Franklin Life Insurance Co. v. United States,* 399 F.2d 757 (7th Cir. 1968); *Jefferson Standard Life Insurance Co. v. United States,* 408 F.2d 842 (4th Cir. 1969); *Bankers Union Life Insurance Co.,* 62 T.C. 661 (1974).

This issue is not a new one. Several decisions, including one by this Court, have held that section 809(d)(12)[10] permits a

---

*Ins. Co. v. Commissioner,* 525 F.2d 786 (10th Cir. 1975), revg. in part and affg. in part a Memorandum Opinion of this Court]. However, we believe congressional authorization would be required to do so."

While this quotation pertains to gain or loss from operations (phase II), the reasoning is equally applicable to the phase I definition of assets.

[9] In a recent decision, the District Court in *Bankers Life Co. v. United States* (S.D. Iowa 1976, 37 AFTR 2d 76-1458, 76-1467, 76-1 USTC par. 9419) held that the loading portion of deferred premiums is an asset "used by * * * [the company] in carrying on an insurance trade or business," as that phrase is used in sec. 805(b)(4). As such, that court held, the loading qualifies for the limited statutory exclusion from the definition of assets. The holding, however, was limited to that part of loading which consists of operating expenses and not profit. Apparently, the District Court was addressing itself· to "administrative loading." As defined by the stipulations of fact and other evidence in this case, loading has no discernible direct relationship to any expenses and is limited to its technical definition. See the text at p. 553 and accompanying n. 2 *supra.* Moreover, the parties do not raise the argument considered in *Bankers Life Co.,* but this argument was given consideration in *Bankers Union Life Insurance Co.,* 62 T.C. 661, 676 (1974), and rejected. See sec. 1.805-5(a)(4)(i), Income Tax Regs., which limits the sec. 805(b)(4) phrase "property * * * used by * * * [the company] in carrying on an insurance trade or business" to specified tangible property.

[10] SEC. 809. IN GENERAL.

(d) DEDUCTIONS.—For purposes of subsections (b)(1) and (2), there shall be allowed the following deductions:

* * *

(12) OTHER DEDUCTIONS.—Subject to the modifications provided by subsection (e), all other deductions allowed under this subtitle for purposes of computing taxable income to the extent not allowed as deductions in computing investment yield.

deduction for accrued commissions on deferred and uncollected premiums. See *Great Commonwealth Life Insurance Co. v. United States,* 491 F.2d at 113-116; *Federal Life Insurance Co. v. United States,* 527 F.2d 1096, 1098-1099 (7th Cir. 1975). In *North American Life & Casualty Co. v. Commissioner* (8th Cir. 1976, 37 AFTR 2d 76-1288, 76-1 USTC par. 9365), affg. 63 T.C. 364 (1974), the Court of Appeals for the Eighth Circuit, to which appeal of this case lies, recently upheld a decision of this Court allowing the deduction. We will follow that holding. Since the rationale of the decisions allowing commission expense deductions is equally applicable to accrued premium taxes on deferred and uncollected premiums, we hold that petitioner is also entitled to the claimed deductions for accrued premium taxes on deferred and uncollected premiums.

As discussed in connection with issues 1, 2, and 3 above, the measurement of the income of life insurance companies on an annual basis requires the use of an accounting fiction: It is assumed that the full premium of each policy is paid on the anniversary date of that policy. The taxpayer is required to include in each year's income the entire premiums from its policies even though it may have received only a portion thereof; the insured has no obligation to pay the remainder; and, consequently, under normally applicable accounting principles, such premiums have not accrued, sec. 1.451-1(a),[11] Income Tax Regs. This fiction is mandated by the NAIC, State insurance regulations, and section 809(c)(1), as interpreted by the courts.

Liability for the commission and premium tax expenses is subject to the identical contingency as the right to the deferred and uncollected premium income—the contingency that such premiums may not be collected. Respondent is satisfied with ignoring this contingency of collection in order to permit the accrual of deferred premiums in income but contends that the same contingency precludes the accrual of the related expenses for commissions and premium taxes. Under the test of proper accruability set forth in section 1.461-1(a)(2),[12] Income Tax

---

[11] Sec. 1.451-1(a), Income Tax Regs., provides in part:

Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. * * *

[12] Sec. 1.461-1(a)(2), Income Tax Regs., states in part as follows:

Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * *

Regs., according to the argument, the commissions and premium taxes had not accrued.

This court has stated its answer to this contention in *North American Life & Casualty Co.,* 63 T.C. at 373, as follows:

Once the fiction of annual receipt of premiums is accepted, it must be applied for all purposes. Upon receipt of premiums, it is clear that a liability to pay commissions arises. Assumption of receipt of premiums necessarily requires recognition of the concomitant liabilities, for the petitioner cannot receive premiums without incurring corresponding commission expenses. *Both the accrual of income and deduction of commissions are subject to the same contingency, that is, the receipt of the premiums. Respondent cannot ignore the contingency in requiring accrual of income yet assert such contingency in determining the accrual of related deductions.* [Emphasis added.]

While that case did not involve premium taxes on deferred and uncollected premiums, we think logic and the goal of accounting symmetry, which are the bases of the decisions concerning accrued commissions, dictate a similar result for accrued premium taxes. As stated by the Eighth Circuit in *North American Life & Casualty Co. v. Commissioner,* 37 AFTR 2d at 76-1291, 76-1 USTC par. 9365:

Once the contingency of premium collectibility is ignored on the income side of the transaction, that same contingency should be ignored for purposes of deducting *directly related expenses* such as agents' commissions. [Emphasis added.]

Premium taxes result directly from premium collection and are directly related expenses. While liability for such taxes does not arise until the premiums are collected, the contingency of collection, as in the case of commissions, does not prevent allowance of the claimed deduction.

We reject, as have other courts which have addressed the issue, the notion that the claimed deductions are in substance an impermissible deduction for loading. *North American Life & Casualty Co.,* 63 T.C. at 375; *Federal Life Insurance Co. v. United States,* 527 F.2d at 1098. Loading is a technical term which denotes the difference between the net premium, which is computed under State-mandated conservative interest and mortality assumptions, and the gross premium, which is computed independently of the net premium utilizing different interest and mortality assumptions. Thus, "loading" in its

technical sense is neither an identifiable expense nor an agglomeration of expenses. Indeed, if gross premiums as calculated by the company exceed the net premiums, the difference may be attributable to the profit margin or other elements, which are not deductible. See *North American Life & Casualty Co.,* 63 T.C. at 374-375.

We hold that the premium taxes as well as the commissions are deductible in the year in which the related premiums are taken into income.

To reflect the foregoing and concessions by the parties,

*Decisions will be entered under Rule 155.*