ANCHOR NATIONAL LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 40452-84.          Filed September 28, 1989.

*John L. Snyder, Ethel R. Kaplan, Paul S. Caselton, George R. Goodman,* and *Francis O. McDermott,* for the petitioner.

*Judy Jacobs Miller,* for the respondent.

PARKER, *Judge:* Respondent determined a deficiency of $4,160,820 for the taxable year 1979 and $3,227,095 for the taxable year 1980. The issues for decision[1] are:

(1) Whether the amounts payable by petitioner on certificates of contribution that it issued to its parent corporation are deductible as interest;

(2) Whether petitioner may reduce its gross premium income by the amount of its anticipated cost of collection in excess of loading on its deferred and uncollected premiums (unpaid premiums);

(3) Whether petitioner must include deficiency reserves as additional premium income when these reserves are transferred to petitioner under a modified coinsurance agreement; and

(4) Whether the expenses attributable to the attendance of spouses of petitioner's home office employees and independent insurance agents at sale conferences are deductible as ordinary and necessary business expenses.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner, Anchor National Life Insurance Co., is an insurance corporation organized under the laws of the State of California, with its principal place of business at all times relevant on Camelback Road at 22nd Street, Phoenix, Arizona. Petitioner's Federal income tax returns for the taxable years 1979 and 1980 were timely filed with the Ogden, Utah, Internal Revenue Service Center.

During all periods relevant, petitioner was a life insurance company as defined in section 801(a).[2] Petitioner was a stock, as opposed to a mutual, insurance company. Washington National Corp. (hereinafter referred to as Washington National) owned, directly or indirectly, 100 percent of

---

[1]In its petition, petitioner alleged that it was entitled to the benefit of operating loss and credit carrybacks from 1981, 1982, and 1983. The parties have stipulated that the amount of these carrybacks can only be determined when the issues for later years are resolved, either by trial or by settlement.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.

the stock of petitioner. Petitioner operated through independent general insurance agents, consisting of approximately 11,190 licensed agents, approximately 1,500 general agents as of March 1, 1978, and brokers who also sold insurance for other companies. These independent general insurance agents were not petitioner's employees, but were instead independent contractors.

Petitioner was subject to regulation by the Department of Insurance of the State of California (hereinafter referred to as the California Insurance Department). It was required to and did file annual statements on the form prescribed by the National Association of Insurance Commissioners (hereinafter referred to as NAIC) with the California Insurance Department and those other States in which it did business.

*Amounts Paid on Certificates of Contribution*

Prior to 1976, petitioner wrote certain single premium deferred annuity contracts with a guaranteed interest rate in excess of 3-percent beyond the first year. One of its annuity plans, ANPLAN, guaranteed for 4 years a stipulated interest rate ranging from 8.05 percent to 5.50 percent. Another such plan was TENPLAN, with a guaranteed 10-year level interest rate of 7.27 percent per annum in which, for contracts dated June 1, 1976, and after, the level interest rate was guaranteed at 7.18 percent per annum. Petitioner ceased writing the TENPLAN annuity contracts during 1976 and the ANPLAN early in 1977 and reinsured this business with other companies.

In early January of 1977, the California Insurance Department disallowed as of December 31, 1976, the method by which petitioner had been calculating its annuity reserves on the two annuity plans, TENPLAN and ANPLAN. The controversy between the California Insurance Department and petitioner concerned the statutory requirements for calculating reserves under these two annuity plans. The method insisted upon by the California Insurance Department required petitioner to increase its annuity reserves by $13 million as of December 31, 1976. On February 10, 1977, petitioner filed suit in the Superior Court of the State of California for the County of Los Angeles challenging the California Insurance Department's method of calculating

reserves. On March 7, 1978, petitioner filed a motion for summary judgment in that case.

Concurrently with this litigation, a bill was introduced in the California legislature based on the NAIC's model valuation law. The new bill would allow petitioner to maintain the reserves that it had established rather than those amounts specified by the California Insurance Department.

Petitioner was confident that the ultimate outcome of the reserve issue would be in its favor, either through litigation or legislation. However, petitioner's management believed that if it was required to maintain the additional reserves as specified by the California Insurance Department prior to the resolution of the reserve issue, then petitioner might appear to be insolvent on its annual statement for the year 1976. If petitioner became insolvent it would first lose its authority to do business in California and thereafter in other States. In addition, petitioner was concerned that insolvency would have an adverse effect on its Best's rating, a rating system for the insurance industry. Agents and policyholders often base their decision to buy or sell insurance of a given company on the quality of the Best's rating that the particular insurance company receives.

Petitioner and Washington National considered various alternatives to provide adequate surplus to petitioner to cover the California Insurance Department's insistence that petitioner's annuity reserves were understated. Petitioner could not borrow the funds from an outside lender because these amounts would then have been reflected as debt on its annual statements rather than as surplus. Washington National decided to lend certain amounts to petitioner in exchange for surplus notes to be paid upon either a favorable resolution of the lawsuit or the adoption of the NAIC model valuation law by California. If neither of these events were to occur, Washington National still expected petitioner to pay the notes out of petitioner's earnings over a period not to exceed 5 years. Petitioner's management anticipated that this would not be a problem for petitioner since the need for the large reserves that the California Insurance Department required for petitioner's two annuity plans would gradually dwindle as the guarantee periods under the ANPLAN and TENPLAN policies expired.

On February 10, 1977, petitioner applied to the California Insurance Department for a permit to issue certificates of contribution to Washington National in exchange for $12 million to provide additional surplus to petitioner pending the determination of a court action. The California Insurance Department at first refused to issue a letter allowing the certificates because the Department disagreed with petitioner's proposed term that the certificates be paid in full: (1) Upon the favorable determination of the lawsuit, (2) upon the adoption by California of the NAIC model valuation law, or (3) in any event out of petitioner's earnings over a period not to exceed 5 years. Washington National informed the California Insurance Department that it would not make the cash loans to petitioner unless the Department agreed to issue the letter allowing the issuance of the certificates as requested, with the exception that the condition for repayment within 5 years would not be required. Instead, Washington National stated that the certificates should specify that if the loans are not paid as a result of either of the first two conditions it had specified, such loans would be repaid in accordance with the existing provisions of California law respecting surplus loans.

On February 25, 1977, the California Insurance Department authorized petitioner to issue certificates of contribution in a face amount not exceeding $12 million to Washington National in exchange for cash in the amount of $12 million. In its authorization, the California Insurance Department specified certain conditions not included in petitioner's application for the certificates, among them, the condition that the interest rate was not to exceed a rate "equal to 1½ percent above the prime bank rate charged by the Continental Illinois National Bank in Chicago, Illinois, and in no event shall the average interest rate ever exceed 10 percent per annum for the period for which the interest is paid." In addition, the California Insurance Department required petitioner to report the $12 million on its annual statement for the period ending December 31, 1976, as an account receivable from Washington National, with the understanding that upon receipt of the $12 million petitioner could attach an affidavit evidencing receipt of the consideration for the certificates of contribution which

would extinguish the accounts receivable item. In annual statements for 1976 and the following years, petitioner listed the $12 million as a surplus contribution. However, on the general interrogatories portion of its annual statement, petitioner reflected the certificates as indebtedness in the form of "outstanding bonds, debentures, guaranty capital notes, etc. * * * ."

The California Insurance Department also stated that the advance to petitioner by Washington National was subject to the relevant provision of Chapter 5 of title 10 of the California Administrative Code. Finally, the California Insurance Department required that the principal sum of each certificate:

shall not be payable in whole or in part, except upon approval in writing by the Insurance Commissioner, after decision of the company's Board of Directors, and only whenever the condition of the company is such that it no longer reasonably requires the sum proposed to be paid upon the principal sum of the Certificate or Certificates of Contribution; provided, however, because of the fact that the advance is being made as the result of a dispute between the Department of Insurance and Anchor National as to the proper method for reserving for the single premium deferred annuity contracts issued by Anchor National, upon the resolution of the litigation between Anchor National and the Department of Insurance by the final decision of a court of competent jurisdiction or upon the enactment of appropriate legislation by the Legislature of the State of California, the Certificate or Certificates of Contribution may be paid in whole or in part depending upon the results of said legislation or litigation.

On February 25, 1977, petitioner issued to Washington National a series of certificates of contribution in various denominations between $100,000 and $1 million, aggregating $12 million. The certificates of contribution[3] followed the exact form for such certificates in Title 10 of the California Administrative Code, except for the amount of the rate of interest payable on the notes, which the California Insurance Department had previously added to petitioner's certificates. A representative sample of such certificates of contribution reads as follows:

---

[3]Depending on the State in which they are issued, such certificates are known by a variety of names, including surplus notes, guarantee fund notes, certificates of contribution, or debenture notes.

## II

The Principal Sum of this Certificate, to wit, One Hundred Thousand Dollars, shall, upon presentation of this Certificate for endorsement of any partial payment, or upon complete surrender for cancellation in return for final payment in full, be payable by the Insurer at its Executive Offices at Phoenix, Arizona, only out of the excess of the admitted assets of the Insurer over the sum of:

1. All liabilities (including, but not limited to claims, losses, reserves, reinsurance, dividends, production and administrative expenses, taxes, loans, and advances), but excluding any amounts for or on account of any outstanding Certificates of Contribution, including this Certificate; and

2. An amount equal to one and one-half times the amount required by the laws of California at the time of such repayment for the issuance of a Certificate of Authority to transact the classes of insurance which Insurer is then transacting anywhere, or which it is authorized to transact in California, or the amount required by the laws of any other jurisdiction for the retention of its Certificate of Authority in that jurisdiction, whichever is the largest amount.

## III

The Principal Sum of this Certificate shall not be payable in whole or in part, except upon approval in writing by the Insurance Commissioner given after the decision of a majority of the Board of Directors of the Insurer made and recorded at a regular or special meeting; provided, however, that the Board of Directors shall be required to exercise such option and vote payment of such Principal Sum, either in whole or in part, whenever the condition of the Insurer is such that it no longer reasonably requires the sum proposed to be paid upon the Principal Sum of this Certificate.

## IV

Interest computed quarterly at the rate of 1 1/2% per annum above the prime rate charged by the Continental Illinois National Bank in Chicago, Illinois, but not in excess of ten percent per annum not compounded shall be due and payable semiannually by the Insurer at its Executive Offices at Phoenix, Arizona, upon the unpaid balance of the Principal sum of this Certificate to the extent, and only to the extent, that funds of the Insurer exist on each such due date to discharge all liabilities within the meaning of Paragraph II hereinabove plus the minimum surplus required by law to be maintained over and above all liabilities for the classes of insurance Insurer is transacting in California, or the amount of surplus required by the laws of the any jurisidiction in which it is licensed to do business to retain unimpaired its Certificate of Authority there, whichever is the larger amount. If no such funds in whole or in part exist on any such due date, such interest for which no funds for payment exist shall not become due or payable but shall accrue and shall become due and payable when and to the extent such funds do come into existence thereafter. Any interest both due and payable by the terms of this

paragraph shall create a cause of action in the Contributor and be a liability of the Insurer.

### V

The obligation evidenced by this Certificate shall not be a liability or claim against the Insurer or its funds or assets at any time except to the extent that the principal Sum hereof, in whole or in part, shall be due and payable in accordance with the provisions of Paragraphs II and III hereof and except to the extent that interest on this Certificate, in whole or in part, shall be due and payable in accordance with the provisions of Paragraph IV hereof.

### VI

Should the Insurer at any time discontinue the insurance business, then, after the payment or provision for payment of all the obligations described in subdivision (1) of Paragraph II hereof, following the determination of such facts by the Insurance Commissioner of the State of California, any remaining funds or assets of the Insurer shall first be applied to the payment of any interest accrued hereon, then to the remaining unpaid balance of the Principal Sum of this Certificate.

### VII

Nothing in this Certificate shall be construed to prevent the Board of Directors of Insurer from declaring and paying dividends or savings to policyholders in the manner and to the extent permitted by law.

In exchange for the certificates of contribution, petitioner received the sum of $12 million from Washington National. Washington National borrowed $10,100,000 of the $12 million that it transferred to petitioner. Washington National borrowed this money in the form of short-term, 90-day revolving notes from three separate lenders totaling $10,100,000 which could be renewed on the appropriate maturity dates and could be repaid at anytime. The notes in the denominations of $2 million and $4,100,000 had interest set at the corporate prime rate. The note in the amount of $4,100,000 had interest set at 110 percent of the corporate prime rate. As time went by, the notes were renewed on a short-term basis but were never converted into a form of long-term debt. Washington National reflected the payments from petitioner as interest income on its financial statements and on its tax returns.

On October 16, 1978, the Superior Court granted petitioner's motion for summary judgment against the California Insurance Department. Although the California Insurance

Department appealed the decision, on January 10, 1980, it abandoned its appeal from the judgment for petitioner.

On December 5, 1980, petitioner wrote to the California Insurance Department requesting that petitioner be allowed to amend the provision of the certificates of contribution limiting the interest to 10 percent. At the time the certificates were issued, the average prime rate was around 6.25 percent per annum and the maximum legal rate in California was not in excess of 10 percent. In November of 1979, the State of California amended its Constitution to allow a legal interest rate in excess of 10 percent. Petitioner made the request to increase the amount of interest it would pay to Washington National, because Washington National's cost of money exceeded the 10-percent limitation in the Certificates of Contribution. At that time, the average prime rate was 17.75 percent per annum.

On April 16, 1981, the California Insurance Department agreed to modify the interest limit in the certificates. The interest payable on the certificates of contribution was amended to the rate of 1 to 1½ percent per annum above the prime rate charged by the Continental Illinois National Bank in Chicago, not in excess of 18 percent per annum, but only to the extent that funds of petitioner existed on each such due date to discharge all liabilities and maintain minimum capital and surplus required by law to be maintained over all liabilities for the classes of insurance petitioner was transacting. The California Insurance Department agreed to the modification, in part, since the parent, Washington National, had to repay its own lender and no cap was put on the amount of interest it had to pay, it seemed "fair, just, and equitable" that the current interest limitation be modified.

In addition to the amendment for interest, on December 5, 1980, petitioner asked for permission to repay Washington National the sum of $500,000 on the principal sum of five of the certificates on the 25th day of February of each year commencing February 25, 1981. On December 11, 1980, petitioner's board of directors adopted a resolution to amend the certificates to increase the interest payable on them. On January 15, 1981, petitioner's board of directors adopted a resolution to amend the certificates to repay the

principal sums of the certificates on the 25th day of February of each year in a sum that is the lesser of "(a) $500,000; or (b) the increase to unassigned surplus of the Company as of December 31, as disclosed by the Annual Statement of the Company for the preceding year." No payments on principal could be made on the certificates of contribution if the payments resulted in reduction of the unassigned surplus of the Company as of December 31, 1980. Without explicit confirmation from the California Insurance Department, but based on assurances from the department that it approved of the repayment plan set forth by petitioner's board of directors, petitioner began making payments, and made payments on the principal of the certificates of contribution as listed below:

| Date | Amount |
| --- | --- |
| Dec. 31, 1980 | $500,000 |
| Feb. 25, 1982 | 400,000 |
| Feb. 25, 1983 | 500,000 |
| Feb. 25, 1984 | 500,000 |
| Feb. 25, 1985 | 500,000 |
| May 13, 1986 | 9,600,000 |
| Total paid | 12,000,000 |

Petitioner paid the interest that accrued on the certificates to Washington National in the amounts of $1,206,666 in 1979 and $1,200,000 in 1980. In addition, petitioner also paid dividends to its sole shareholder, Washington National, separate and apart from the interest payments in the amounts of $1,000,635 for 1979, and $1,502,708 for 1980. Petitioner deducted the interest payments on its respective Federal income tax returns in computing its gain from operations in 1979 and 1980. In the notice of deficiency, respondent disallowed these interest deductions on the ground that the amounts were not established as having been paid on a bona fide debt.[4]

---

[4]Petitioner mistakenly treated $110,133 as part of the interest on the certificates on its financial statements and annual statements for the taxable year 1980. Both parties agree that this amount was not attributable to the certificates and is deductible for the year in question without regard to whether the certificates of contribution constitute debt or equity.

*Cost of Collection in Excess of Loading*

As a life insurance company petitioner is required by the California Insurance Department and other States in which it does business to file with the insurance department of each State an annual statement for each calendar year in the form approved by the NAIC.[5] On these annual statements the NAIC requires that an insurance company include all of its premiums as income.

Many of petitioner's policyholders paid their annual premiums in installments throughout the year rather than in a single amount on the policy anniversary date. Such unpaid premium installments are referred to as "deferred premiums." When a premium payment was due, but unpaid, petitioner was required by State law to maintain a policy in force during a grace period, which was normally 30 days. The policyholder could pay the delinquent premium during the grace period, and thereby prevent the policy from lapsing. The policyholder, however, was under no legal obligation to make the premium payment. These unpaid premiums are referred to as "uncollected premiums." Petitioner was required by NAIC to report the full amount of the deferred and uncollected premiums (unpaid premiums) on its annual statements as premium income, and to record as an asset on its annual statements the net valuation premium portions thereof.

The gross premium is the total premium that is charged to the purchaser of the insurance, i.e., charged to the policyholder. The gross premium is determined by the insurance company and is based on its actuary's determination of realistic assumptions for mortality and interest rates. It is made up of two components: the "net valuation premium" and "loading." Under State law the net valuation premium is the amount out of the gross premium that the company is required to add to its reserves to ensure that the company will have sufficient funds to pay policy benefits. The reserve for a life insurance policy is that amount which together with the future net valuation premiums and interest credited to the reserve will be

---

[5]The NAIC is an organization of State insurance commissioners. The purpose of the NAIC is to prescribe model regulations and laws that the States can adopt so that insurance companies will be uniformly regulated by States across the country.

sufficient to pay the claim when it arises. The amount of the net valuation premium is based upon legally required interest and mortality assumptions, which are generally more conservative estimates than the assumptions the company uses for gross premiums. The other component of the gross premium is called "loading" and covers profits and expenses such as the cost of maintenance of records of collection, agents' commissions, and State premium taxes.

The amount of the gross premium, including loading, is determined by the company. Since the net valuation premium is determined by legally required interest and mortality assumptions, while the gross premium is determined by the company, loading may not necessarily include any profit and may not cover all expenses. In fact, the gross premium set by the company may on occasion be less than net valuation premium. Loading exists only if the gross premium is greater than the net valuation premium. However, if the net valuation premium is greater than[6] or close to the amount set for the gross premium, the loading amount may not be sufficient to cover expenses. Often the expenses of the first year policy exceed those of subsequent years since selling expenses, including the agents' commissions, expenses of medical examinations, approving applications, preparing policies, and setting up records for new policies are all incurred in the first year of the policy. When the company's expenses are anticipated to exceed the loading amount it computed, these excess expenses are referred to as the "cost of collection in excess of loading." The cost of collection in excess of loading seems, in a sense, to be a part of (or a dipping into) the State-required net valuation premium since any gross premium amount greater than the net valuation premium is loading.[7]

---

[6]Since the gross premium (what the company decides to charge a policyholder) is based on its actuary's determination of realistic mortality assumptions and the net valuation premium is the amount the State requires an insurance company to add to its reserves, the net valuation premium may on occasion be greater than the gross premium. This is especially prevalent in a competitive market when the insurance company may decide to initially specify lower premiums, thereby requiring that the deficiency between the lower gross premium and net valuation premium be made up by setting up a deficiency reserve at the time the policy is issued. This matter of deficiency reserves is addressed in the third issue in this case.

[7]If the gross premium itself is less than the State-required level for net valuation premium (note 6, *supra*), then it is difficult to conceptualize the source of payment for any of the expenses, whether designated as loading or as cost of collection in excess of loading. The explanation no doubt lies in the fact that reserves, loading, etc. are computed on whole blocks of insurance and not on a policy-by-policy basis.

Beginning in 1979, petitioner had a cost of collection in excess of loading on deferred and uncollected premiums due to a new form of annual renewable term policies sold by petitioner referred to as "ART-B policies." This cost of collection in excess of loading was due to the fact that agents received 100 percent of the first year's premium as a commission in the first year and so the costs of collection were much higher.[8]

The annual statement form prescribed by the NAIC and adopted by the California Insurance Department required that all deferred and uncollected gross premiums (unpaid premiums), whether or not received, be included in premium income and that the related net valuation premiums (gross premiums less loading) be included in assets. The annual statements also required that the annual increase in loading on deferred and uncollected premiums and the annual increase in the cost of collection in excess of the loading on such premiums be shown as reductions in petitioner's gain from operations. In addition, the cost of collection in excess of loading on deferred and uncollected premiums is required by the NAIC rules to be shown as a liability. Petitioner followed the NAIC rules with respect to deferred and uncollected premiums during the years in issue.

For the taxable years 1979 and 1980, petitioner had increases in its costs of collection in excess of loading on deferred and uncollected premiums in the amounts of $1,983,287 for 1979 and $320,320 for 1980. For Federal income tax purposes, petitioner included the total gross deferred and uncollected premiums (unpaid premiums) in premium income, then deducted the loading portion. Petitioner also reduced this premium income by its anticipated cost of collection in excess of loading on the deferred and uncollected premiums. Respondent does not dispute the correctness of the figures for the costs of collection in

---

[8]Generally petitioner's liability for an agent's commission during the first year of a new policy was contingent upon the receipt of the corresponding premium. However, with respect to the ART-B policies, petitioner made available a program in which it would lend the commission to an agent even though the premium had not been collected. Under the ART-B policies, 90 percent of petitioner's agents requested an advance of the entire first-year commission (100 percent of the premium) at the inception of the policy. While there was to be a charge-back of any such advance of the commission if the ART-B policy was cancelled within 25 months, in practice petitioner had difficulty recovering the commission advances from the agents many of whom no longer sold petitioner's products by the time the policy was canceled.

excess of loading, but contends that the premium income should not have been reduced by the amounts.[9]

*Gross Premiums From Entering Modified Coinsurance Agreement*

Petitioner entered into a Life Automatic Reinsurance Agreement with Occidental Life Insurance Co. of California (hereinafter referred to as Occidental) that was effective December 31, 1979. The purpose of this agreement was to give rise to a modified coinsurance contract under which Occidental as the reinsured would retain ownership of the assets in relation to the reserves on the policies reinsured, within the meaning of section 820(b)(2).

Occidental is a life insurance company that is unrelated to petitioner or Washington National. Under the agreement, Occidental reinsured 100 percent of its retained in force insurance of individual life risks issued by Occidental under its Commercial 95 plan of insurance, where the policies bore any policy date between January 1, 1974, and December 31, 1979, but not exceeding $150,000 for any policy, with petitioner as reinsurer.

Under the reinsurance agreement, Occidental, as the ceding insurer, agreed to pay and was treated as having paid to petitioner, as the reinsurer, an initial consideration in an amount equal to the sum of the statutory reserve of $11,703,744, and the deficiency reserve of $1,852,244 as of the effective date of the agreement, December 31, 1979, amounting to $13,555,988, less an allowance of $146,297 to Occidental which was equal to 1.25 percent of the statutory reserve. Petitioner and Occidental properly consented to the application of section 820(a)(1) and the rules provided by and prescribed under section 820(c) to the policies reinsured under the agreement.

The modified coinsurance agreement provided that within 60 days following the close of each calendar year petitioner would pay Occidental the amount of the annual reserve increase. This reserve increase was to be equal to the total statutory and deficiency reserves as of December 31 of the

---

[9]The notice of deficiency also determined that petitioner impermissibly changed its method of accounting in regard to the cost of collection in excess of loading. In his brief, respondent conceded this issue.

year for all the insurance being reinsured, less the total statutory and deficiency reserves as of December 31 of the next preceding calendar year for all such insurance. For purposes of this provision, the reserve as of December 31, 1978, was stated to be zero. Pursuant to this provision, during the taxable year 1979 petitioner was treated as having paid to Occidental an amount equal to the total statutory and deficiency reserves on the insurance reinsured as of December 31, 1979, amounting to $13,555,988. As part of its general language, the agreement further specified that "The Reinsurer shall refund to Occidental all unearned reinsurance premiums, less applicable allowances, arising from reductions, terminations and changes as described in this Article."

Occidental neither paid the initial consideration of $13,555,988, less 1.25 percent of the statutory reserve, to petitioner nor did petitioner repay the sum of $13,555,988 to Occidental. Occidental merely retained the reserves and the assets in relation to the reserves on the policies reinsured with petitioner under the agreement.

Petitioner included in its gross premium income for the taxable year 1979 an amount equal to the December 31, 1979, statutory reserve of $11,703,744 (less 1.25 percent thereof), but not the deficiency reserve. Petitioner took a deduction for the increase in its statutory reserve in the amount of $11,703,744 under section 809(d)(2) by reason of having entered the modified coinsurance agreement. Petitioner did not claim any deduction for the increase in the deficiency reserve of $1,852,244 resulting from entering the modified coinsurance agreement because under section 801(c) the term "total reserves" does not include deficiency reserves.

In the statutory notice of deficiency for the taxable year 1979, respondent increased the amount included by petitioner in its gross premium income by an amount equal to the deficiency reserve of $1,852,244 on the policies reinsured from Occidental. Respondent allowed a deduction for the taxable year 1979 for an increase in the statutory reserve of $11,703,744. No deduction was allowed for the $1,852,244

deficiency reserve. There is no issue in this case as to the ceding commission paid by petitioner to Occidental.[10]

*Spouses' Attendance at Sales Conferences*

Petitioner held a seminar at the Canyon Hotel in Palm Springs, California, on April 3-7, 1979. The seminar was attended by 30 people, of which 19 were home office employees and insurance agents and 11 were their spouses. The total costs incurred by petitioner for travel, hotel, food, and entertainment in connection with the seminar amounted to $19,302, of which $5,192 was attributable to spouses.[11]

Petitioner held a sales conference at the La Posada Resort in Scottsdale, Arizona, on November 16-20, 1980. The sales conference was attended by 351 people, of which 192 were home office employees and insurance agents and 159 were their spouses. The total costs incurred by petitioner for travel, hotel, food, and entertainment in connection with the sales conference amounted to $208,067, of which $88,454 was attributable to spouses.[12]

Petitioner held a sales conference at the Southampton Princess Hotel in Bermuda on October 15-19, 1980, and incurred expenses amounting to $465,236 in connection with the holding of this sales conference.[13] The sales conference was attended by 252 people, of which 136 were home office employees and insurance agents and 116 were their spouses. The total costs incurred by petitioner for expenses amounted to $465,236, of which $159,308.54 was attributable to spouses.

The agents selected by petitioner to attend the conference were not employees of petitioner, but were independent contractors who were essentially self-employed and chose to sell petitioner's products. The agents who were invited to

---

[10]The parties stipulated that respondent would include in petitioner's gross premium income for the taxable year 1979 an amount equal to the sum of the statutory reserve (less a ceding commission deduction equal to 1.25 percent thereof), or $11,557,447, and the deficiency reserve of $1,852,244. In effect respondent has allowed petitioner a deduction for the ceding commission it was deemed to have paid to Occidental.

[11]The parties stipulated that the notice of deficiency overstated the amount attributable to the spouses by $2,937.

[12]The parties have stipulated that the notice of deficiency overstated the amount attributable to the spouses by $50,554.

[13]Respondent disallowed this entire amount in the notice of deficiency. In his brief respondent conceded the deduction of the claimed expenses attributed to the attendance of petitioner's agents and employees, but not their spouses, at the Bermuda conference as ordinary and necessary business expenses.

the conferences were top producers in terms of selling petitioner's products. The purpose of the sales conferences was to assemble these agents to discuss methods of promoting the sale of petitioner's products and to introduce new products.

Petitioner invited all of the spouses of the selected agents whether the spouses were actively involved in the agent's business or not. Spouses of petitioner's home office employees also attended the conferences. Home office employees and their spouses would arrive early to help greet the agents and their spouses as they arrived at the conferences. In addition, home office employees and their spouses would host small dinner parties for the agents and their spouses on the evenings that no formal dinner was scheduled. The spouses were not required to attend any of the meetings during the sales conferences, and there is no evidence that the spouses attended or participated in these meetings.[14]

In the notice of deficiency respondent disallowed the amounts attributed to the attendance of the spouses at the Palm Springs, Scottsdale, and Bermuda sales conferences.

OPINION

I

*Certificates of Contribution: Debt or Equity*

The first issue for decision is whether the amounts payable by petitioner on certificates of contribution that it issued to Washington National, its sole shareholder, are deductible as interest. Petitioner argues that the certificates of contribution constituted debt and so the amounts payable and paid on the certificates are deductible as interest. On the other hand, respondent argues that the $12 million transferred to petitioner in exchange for the certificates constituted a capital contribution by Washington National and the later payments made to Washington National by petitioner are nondeductible dividends.

---

[14]The Court found the testimony of John Hinfey as to the participation of the spouses in the agents' businesses or at the conferences to be little more than vague, generalized, unsupported speculation. These are matters which are readily susceptible of proof, and petitioner has failed to present any probative or persuasive evidence.

Section 809(d), as it read for the years before the Court,[15] generally provides that a life insurance company is allowed all of the deductions provided under subtitle A for computing taxable income. Section 163 allows a deduction from gross income for interest paid or accrued within the taxable year. The Code does not allow a deduction for dividends paid to shareholders. In distinguishing between debt and equity, the courts resolve the issue on a case-by-case basis, depending upon the facts and circumstances of the particular case. *John Kelley Co. v. Commissioner*, 326 U.S. 521, 530 (1946); *Harlan v. United States*, 409 F.2d 904, 907 (5th Cir. 1969); *Union Mutual Insurance Co. v. Commissioner*, 46 T.C. 842, 844 (1966), affd. 386 F.2d 974 (1st Cir. 1967). In determining whether a payment is interest or a dividend, the U.S. Court of Appeals for the Ninth Circuit, to which any appeal in this case will lie, has identified 11 factors to be considered, none of which is determinative of the ultimate issue. These factors include: (1) The names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payments of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization;[16] (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions. *Hardman v. Commissioner*, 827 F.2d 1409, 1411-1412 (9th Cir. 1987); *Bauer v. Commissioner*, 748 F.2d 1365, 1368 (9th Cir. 1984), revg. a Memorandum Opinion of this Court; *A.R. Lantz Co. v. United States*, 424 F.2d 1330, 1333 (9th Cir. 1970); *O.H. Kruse Grain & Milling v. Commissioner*, 279 F.2d 123,

---

[15]As noted in note 2, *supra*, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in this case, 1979 and 1980. Thus, the section references are to the Internal Revenue Code prior to the Deficit Reduction Act of 1984, which repealed the Life Insurance Company Income Tax Act of 1959, Pub. L. 86-69, 73 Stat. 112, and enacted a new Part I of Subchapter L relating to the taxation of insurance companies. See Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 211, 98 Stat. 720-757.

[16]Here we will not discuss petitioner's debt to equity ratio because both petitioner and respondent agree that due to the large reserves that an insurance company must maintain, it is difficult to determine a meaningful debt to equity ratio with respect to insurance companies. Moreover, excluding reserves, petitioner's debt to equity ratio was close to 1:1, a factor favorable to petitioner.

125-126 (9th Cir. 1960). No single one of these factors is alone determinative and these factors should be used only as aids in analyzing the transaction. *Fin Hay Realty Co. v. United States,* 398 F.2d 694, 697 (3d Cir. 1968). Analysis of these factors, including objective evidence of the intent of the parties, leads to the resolution of the ultimate issue of whether the parties intended the advance to create debt or equity and the genuineness of repayment prospects in light of economic realities. *Bauer v. Commissioner, supra,* 748 F.2d at 1367; *A.R. Lantz Co. v. United States, supra,* 424 F.2d at 1333-1334; *Dixie Dairies Corp. v. Commissioner,* 74 T.C. 476, 494 (1980); *Litton Business Systems, Inc. v. Commissioner,* 61 T.C. 367, 377-378 (1973); *Santa Anita Consolidated, Inc. v. Commissioner,* 50 T.C. 536, 552 (1968).

In the case of a mutual insurance company, in addition to the above factors, this Court has looked at the unique financing requirements of that type of company in determining whether an advance is debt or equity. *Union Mutual Insurance Co. v. Commissioner, supra,* 46 T.C. at 844. In that case, we concluded that guaranty fund certificates issued by a mutual insurance company to provide a reserve required under State law to write policies constituted a debt. We held that the certificates were debt because the advance evidenced by each certificate was for a fixed amount, the interest rate was fixed, the certificates could be transferred, the interest had been paid every year, including 2 loss years, and most importantly, because the usual methods of borrowing money were not available to the mutual insurance company and no tax avoidance scheme was involved. 46 T.C. at 844-846. We held that the certificates were debt despite the fact that: (1) Holders of the certificates were entitled to elect half of the directors, (2) interest was payable only if sufficient net profits or unused premiums were available after payment of expenses and losses, and (3) the certificates had no fixed maturity date. 46 T.C. at 843. In affirming this Court, the U.S. Court of Appeals for the First Circuit concluded that, despite having many attributes of equity, the certificates were debt because of the necessary requirements and methods for financing that mutual insurance companies must follow, since the companies cannot issue stock to raise money, and

may only issue guaranty certificates. *Commissioner v. Union Mutual Insurance Co.,* 386 F.2d 974, 978 (1st Cir. 1967), affg. 46 T.C. 842 (1966).

One of the factors that separates insurance companies, whether they are stock or mutual, from other businesses is that insurance companies must retain large reserves (surpluses) to provide policyholders reasonable protection against loss. *Property Owners Mutual Insurance Co. v. Commissioner,* 28 T.C. 1007, 1016 (1957). Often insurance companies must issue some type of surplus notes to create sufficient reserves until the company can gradually accumulate sufficient reserves. *Property Owners Mutual Insurance Co. v. Commissioner, supra; Holyoke Mutual Fire Insurance Co. v. Commissioner,* 28 T.C. 112, 118 (1957). As those cases show, this Court has consistently refused to treat those surplus notes as equity in the case of mutual insurance companies.

In Revenue Ruling 68-515, 1968-2 C.B. 297, respondent announced that he would follow the First Circuit in *Commissioner v. Union Mutual Insurance Co., supra.* In the revenue ruling, respondent noted that because of the unique financing problems that mutual insurance companies encounter in having to raise sufficient capital as reserves to qualify to do business in various States, guaranty fund certificates issued by a mutual insurance company would be considered to be debt. Respondent concluded by stating that this determination did not apply to nonmutual stock insurance companies since those companies did not encounter the same unique financing problems. Rev. Rul. 68-515, 1968-2 C.B. 297.

The U.S. Court of Appeals for the Fifth Circuit, however, considered the unique financing requirements of nonmutual insurance companies that issued stock and held that their "surplus capital notes" constituted debt rather than equity. *Jones v. United States,* 659 F.2d 618, 619 (5th Cir. 1981); *Harlan v. United States, supra,* 409 F.2d at 909. In *Harlan v. United States,* the Fifth Circuit concluded that the distinction respondent drew between mutual insurance companies and stock insurance companies was not material under the facts in that case. 409 F.2d at 907, 909. The Fifth Circuit concluded that surplus notes issued by a closely held

corporation to its sole shareholder to create necessary capital surplus under State law, which stated that the notes were only to be repaid to the extent that surplus funds exceeded $12,500, constituted debt rather than equity. 409 F.2d at 910. In debt-equity cases, the Fifth Circuit has adopted and applies the 11 factors used by the Ninth Circuit.[17] The Fifth Circuit, in the *Harlan* case, noted that while one of the factors is whether a fixed maturity date exists, the fact that the payment of the surplus notes was contingent upon surplus funds in excess of $12,500 did not indicate that it was a contribution to capital, especially since the two notes were repaid in a relatively short time, 2 and 3 years, respectively. 409 F.2d at 909.

In *Jones v. United States, supra,* 659 F.2d at 620, the Fifth Circuit pointed out that, as a stock insurance company that was regulated by State statute, the corporation was required to maintain high levels of cash capital and surplus so the policyholders would be adequately protected. In an effort to maintain this high level of surplus, the insurance company in that case received permission from the insurance commissioner in one of the States in which it did business to execute surplus capital notes to its majority shareholders. These notes were used since such notes permitted lenders to hold the insurer liable only to the extent that the insurer's surplus exceeded a given amount, usually at the surplus level required by States in which it did business, and so protected the policyholders. The Fifth Circuit, applying the same 11 factors used by the Ninth Circuit, held that the surplus notes constituted debt rather than equity. 659 F.2d at 622. The court relied on the facts that: (1) The term "surplus capital note" was nomenclature common in the insurance business to refer to a debt executed in contemplation of applicable State surplus capitalization requirements, and (2) the corporation was adequately capitalized. The Fifth Circuit concluded that the notes constituted debt in spite of the fact that the notes were not paid at their maturity date due to the fact that the note specified that no payments of interest or principal

---

[17]The Fifth Circuit applies the identical factors that the Ninth Circuit applies when determining whether an advance is debt or equity. *Plantation Patterns, Inc. v. Commissioner,* 462 F.2d 712, 719 (5th Cir. 1972); *Berkowitz v. United States,* 411 F.2d 818, 820 (5th Cir. 1969).

could be paid that would reduce the surplus below $250,000; that the creditors of the note were subordinated to other corporate creditors, a situation required by State law to protect policyholders; and that the two shareholders making the advances held 90 percent of the stock. 659 F.2d at 622-623. In *Jones v. United States,* the critical factor in concluding that the note was debt was that State laws and regulations were the reason the parties structured the debt transaction in the way that they did. 659 F.2d at 622-623.

In the present case, respondent contends that the certificates petitioner issued were actually capital contributions made by petitioner's sole shareholder and that petitioner's later payments to this shareholder were actually dividends. Respondent bases his argument on the fact that petitioner is a stock rather than mutual insurance company and therefore such certificates are not recognized as debt under Revenue Ruling 68-515, and on the fact that it took petitioner 6 years to repay the $12 million after the resolution of the dispute that initially created the need for the funds. In deciding whether the amounts paid by petitioner to its shareholder, Washington National, were interest payments or dividends, this Court must examine all of the facts and circumstances surrounding the issuance of the certificates of contribution.

In analyzing the relevant factors that the Ninth Circuit applies in such debt-equity cases, we first consider the name given to the certificate. The issuance of a stock certificate indicates an equity contribution; the issuance of a bond, debenture, or note is indicative of indebtedness. *Estate of Mixon v. United States,* 464 F.2d 394, 403 (5th Cir. 1972). In *Jones v. United States, supra,* 659 F.2d at 622, the Fifth Circuit held that the term "surplus capital notes" was nomenclature common in the insurance business to refer to a debt executed in contemplation of applicable State surplus capitalization requirements. In the present case, the term "certificate of contribution," like surplus capital notes, was nomenclature common in the insurance business to refer to a debt executed in contemplation of applicable State surplus capitalization requirements for emergency financing. Cal. Admin. Code tit. 10 sec. 2612.01 (1971). Under title 10 of the California Administrative Code, section 2612.01, certifi-

cates of contribution evidence a contingent promise to repay and are not regarded as a commercially salable security. In addition, under title 10 of the California Administrative Code, section 2612.05 states that certificates of contribution "shall be reported * * * on the appropriate line on page 3 of the annual statement either as 'contribution certificates', 'outstanding contribution certificates', or 'contributed surplus'."

Respondent argues that the certificates are not debts, pointing to the last sentence in section 2612.05 of title 10 of the California Administrative Code which states that descriptions such as " 'debentures', 'surplus notes', 'guaranty fund', or 'guaranteed certificates' are deemed misleading and are not permitted * * * ." However, we agree with petitioner's expert witness that this sentence merely indicates that the term "certificate of contribution" is the name the State of California has chosen to give notes that an insurance company could issue when it needed emergency financing. We conclude that the fact that the California Administrative Code required that the notes not be called surplus notes or guaranty fund certificates was to distinguish instruments issued in California from instruments issued in other States for emergency financing. Thus, the name, "certificate of contribution," given to the notes issued by petitioner, is not inconsistent with, and indeed supports, a conclusion that the advances more closely resemble debt than equity.

Another factor is the presence or absence of a maturity date. The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation. The absence of the same, on the other hand, may indicate that repayment is in some way tied to the fortunes of the business, and thus indicative of an equity interest. See *Tyler v. Tomlinson,* 414 F.2d 844 (5th Cir. 1969). In the present case, petitioner and Washington National attempted to draft the certificates so that the certificates would be paid in full: (1) Upon the favorable determination of the California lawsuit, (2) upon the adoption by California of the NAIC model valuation law, or (3) out of petitioner's earnings over a period not to exceed 5 years. The California Insurance Department, however, refused to authorize peti-

tioner's proposed provision with its clear repayment terms and instead required that the sums not be paid until petitioner received approval in writing from the Insurance Commissioner when petitioner no longer reasonably required the principal sum. Thus, the California Insurance Department itself dictated the absence of the maturity date of not to exceed 5 years that petitioner wanted to include in the certificates. Therefore, in this case, the fact that no fixed maturity date was specified does 'not indicate that the certificates constitute equity since the California Insurance Department mandated the absence of a fixed maturity date.

Another factor to consider is the source of the payments. If repayment is possible only out of corporate earnings, the advance has the appearance of a contribution of equity capital, while if repayment is not dependent upon earnings, the advance reflects a loan to the corporation. See *Harlan v. Commissioner, supra.* In the present case, the California Administrative Code prescribed that the principal of an advance evidenced by a certificate of contribution be paid out of the excess of the admitted assets over the sum of all liabilities and an amount equal to one and one-half times the amount required by the laws of California to transact insurance. In *Harlan v. United States, supra,* 409 F.2d at 909, and *Jones v. United States, supra,* 659 F.2d at 622, the Fifth Circuit concluded that, with regard to insurance companies, the fact that State law restricts repayment to a time when surplus funds exceed a certain amount is not determinative that the note is equity rather than debt since this restriction is required by State law to protect policyholders. We agree that this factor carries little weight in the determination of whether an instrument is debt or equity when State law imposes this restriction on insurance companies for the repayment of notes and certificates. Moreover, we view such State-law restrictions as more a matter of timing, restricting not so much the source of repayments as the timing of such repayments.

Another factor is whether the party that makes the advances to the corporation participates in the management of the corporation. The fact that the stockholders have an interest in management in a corporation in proportion to their loans or that the shareholder is the sole shareholder

does not prevent an advance to that corporation from being bona fide indebtedness. *Tomlinson v. The 1661 Corp.,* 377 F.2d 291, 297 (5th Cir. 1967); *Litton Business Systems, Inc. v. Commissioner, supra,* 61 T.C. at 381. However, the form of the transaction and the labels parties place on the transaction may not have as much significance when the corporation is closely held because the parties can mold the transaction at their will. *Fin Hay Realty Co. v. Commissioner, supra,* 398 F.2d at 697. In addition, if the advances by the shareholder were expended on the purchase of original assets or to meet current operating expenses, and little reasonable hope existed that any substantial portion of the advances could ever be repaid or could not be repaid for a number of years, courts have determined that in those circumstances advances to one's closely held corporation are contributions to capital rather than loans. *Fin Hay Realty Co. v. Commissioner, supra,* 398 F.2d at 698; *Wachovia Bank & Trust Co. v. United States,* 288 F.2d 750, 756 (4th Cir. 1961).

In the present case, the advances made by Washington National in exchange for the certificates were obtained with a particular financial need in mind. The advances were needed to supply emergency financing suddenly required by the California Insurance Department, and not to meet petitioner's current operating expenses. In addition, petitioner and its sole shareholder determined that the advances could be repaid either upon the favorable determination of petitioner's lawsuit or upon the adoption of favorable legislation. If neither of these events took place, petitioner and its sole shareholder still determined that petitioner would still be able to repay the certificates because petitioner no longer issued the particular annuity plans that required the larger reserves according to the California Insurance Department, and thus petitioner's need for the large reserves would dwindle as the guarantee periods for those annuity plans expired, and petitioner could then pay the certificates. At most that would be a 5- to 10-year period. Thus, the fact that Washington National was petitioner's sole shareholder does not settle the issue of whether the advance is debt or equity, particularly since the advance was not made to pay for original assets or current

operating expenses and since there was a reasonable expectation that the advance would be repaid.

The intent of the parties to the transaction is another factor considered in determining whether an advance is debt or equity. It is clear in this case that the parties, petitioner and Washington National, intended that the money advanced to petitioner be repaid as a debt when its financial dilemma with the California Insurance Department was resolved. The parties initially wrote to the California Insurance Department requesting that repayment of the certificates of contribution be made upon the resolution of the conflict between petitioner and the Department, either through litigation or legislation, or out of petitioner's earnings over a period not to exceed 5 years. In its corporate meeting, Washington National referred to the amounts advanced to petitioner as "cash loans." Washington National borrowed the money to advance to petitioner through short-term, 90-day revolving notes. These notes were renewed on a short-term basis as time went by and never converted to long-term notes. In addition, in each of its annual statements petitioner reflected the amount owed on the certificates as a liability in the form of "outstanding bonds, debentures, guaranty capital notes, etc. * * * ." Soon after the controversy between petitioner and the California Insurance Department was resolved, petitioner began discussing with the California Insurance Department the repayment of the certificates. Neither petitioner nor Washington National ever intended that the certificates constitute or be converted into contributions to capital.

Another factor considered is whether interest payments exist and whether they are paid only out of dividend money. The failure to insist on interest payments ordinarily indicates that the parent corporation is not seriously expecting any substantial interest income, but instead is interested in the future earnings of the subsidiary. *Curry v. United States,* 396 F.2d 630, 634 (5th Cir. 1968), cert. denied 393 U.S. 967 (1968). In the present case, the provision for interest was clearly specified in the Certificates of Contribution. In addition, the interest provision was later modified due to the fact that the prime rate had increased since the certificates were first issued and Washington National had

to pay this higher prime rate with the notes that it took out to provide the funds for petitioner. The fact that the certificates stated that interest could not be paid to the extent that payment would reduce petitioner's surplus below the minimum required by the California Insurance Department does not mean that the advances were equity since by State law petitioner could not reduce its surplus to levels below State requirements. The parties to the transaction clearly intended that interest be paid and interest was paid. Moreover, petitioner paid dividends to its shareholder, separate and apart from the interest payments, in the amounts of $1,000,635 for 1979 and $1,502,708 for 1980. Thus, the interest provisions reflect that the advance was more characteristic of a debt than equity.

A final factor considered by the Ninth Circuit, the ability to obtain loans from outside lending institutions, was not really applicable here. Due to petitioner's unique financing problems, needing additional surplus to account for on its annual statements at least temporarily, petitioner could not seek a loan from an outside source. The California Insurance Department required that the amounts petitioner received be listed on its books as contribution surplus rather than a debt. Petitioner would have had to classify any money from outside sources as debt rather than surplus on its annual statements, and petitioner's dilemma would have remained. In addition, the Fifth Circuit, in *Jones v. United States, supra,* 659 F.2d at 623, determined that the fact that outside lenders might not have been willing to lend money to the corporation was a reason why the shareholders would have had to lend the money to their corporation.

A further, and what we consider critical, factor in this case was the fact that petitioner was a stock insurance company regulated by State statute. Under title 10 of the California Administrative Code, section 2612.01 states that certificates of contribution are customarily issued when an insurance company requires emergency financing. Just such emergency financing was required in this instance when the California Insurance Department determined that petitioner was required to maintain larger reserves for its ANPLAN and TENPLAN annuity plans. Although petitioner filed suit against the California Insurance Department and ultimately

prevailed in its position as to the reserves it needed for those annuity plans, petitioner needed to acquire additional surplus before it filed its annual statement to avoid the appearance of insolvency under the California Insurance Department's reserve calculations. After considering various ways of increasing the reserves to avoid this appearance of insolvency, Washington National loaned the additional surplus to petitioner in exchange for the certificates.

As in *Jones v. United States, supra,* and *Harlan v. United States, supra,* Washington National advanced amounts to petitioner to maintain the high levels of reserves that the California Insurance Department required of the insurance company. As in *Jones v. United States, supra,* petitioner and Washington National obtained permission from the California Insurance Commissioner to issue the certificates for the advances and followed the legal requirements in California for such certificates. In both of those cases, the critical factor was the fact that State laws and regulations required that the transaction be structured the way that it was. Thus, that the surplus notes in those cases and the Certificates of Contribution in this case might have some characteristics of equity did not mean the transaction was a contribution to capital, since the insurance companies were required to draft the notes or certificates according to State law specifications.

In the present case, petitioner and Washington National followed the exact language prescribed by the State of California in title 10 of the California Administrative Code, section 2612.02, and by the California Insurance Commissioner for the issuance of the certificates of contribution, including the interest to be charged and the conditions for the repayment of the certificates. In addition, petitioner reported the receipt of the $12 million in exchange for the certificates in its annual statement in the manner required by the California Insurance Department. This Court has previously considered the unique financing situation encountered by mutual insurance companies and has held that surplus notes issued by such companies constitute debt. See *Union Mutual Insurance Co. v. Commissioner, supra.* Although stock insurance companies may issue stock to obtain funds, the stock insurance companies, like mutual

insurance companies, still have the unique financing situation in which they must maintain large reserves (surpluses) according to the State in which they are doing business in order to protect the policyholders. Thus, we conclude that in this case where certificates were issued for emergency financing according to the requirements imposed by the State of California and where petitioner intended to and did repay the certificates, the advances constituted debt rather than equity.

Our conclusion is not changed by the fact that there was some delay in repaying the certificates. That petitioner took 6 years to repay the certificates does not affect our decision that the advances constituted debt. The California Insurance Department wrote to petitioner that it could issue the certificates provided that the principal "shall not be payable in whole or in part, except upon approval in writing by the Insurance Commissioner * * * ." That same sentence in that letter went on to state that the certificates "may be paid in whole or in part depending upon the results of said legislation or litigation." These conditions appear contradictory and unclear, but we think these are just matters of timing and do not affect the essential character of the obligation to repay borrowed money.

After the California Insurance Department abandoned its appeal on January 10, 1980, petitioner then sought the approval of the California Insurance Department before making payments on the certificates. Petitioner began making payments once it received assurances that the California Insurance Department approved petitioner's repayment plan. We do not think that this lapse of time between the California Insurance Department's abandonment of its appeal on January 10, 1980, and the first repayment of a portion of the advances on December 31, 1980, is a reason to characterize the certificates as equity rather than debt, especially in light of the confusing letter setting forth repayment conditions previously sent by the Insurance Commissioner. Nor do we consider the 6 years that it took to repay the advances a reason to hold that the certificates of contribution constituted equity rather than debt. We are satisfied there was a fixed obligation to repay the certificates of contribution, they were ultimately repaid,

and the amounts paid or incurred during the years before the Court constituted deductible interest on bona fide indebtedness.

## II

### *Cost of Collection in Excess of Loading*

The second issue is whether the cost of collection in excess of loading on deferred and uncollected premiums is deductible from gross premiums when determining an insurance company's gain from operations for Federal tax purposes. Petitioner argues that the cost of collection in excess of loading is deductible from gross premiums since the NAIC allows the deduction of both loading and the cost of collection in excess of loading on deferred and uncollected premiums. Respondent argues that only the net portion (net valuation premium) of deferred and uncollected premiums is included in a company's assets, gross premium income, and reserves. This means, respondent argues, that while loading is "effectively" excluded from gross premiums, cost of collection in excess of loading is not.

With regard to the taxation of life insurance companies, subchapter L of the Code (sec. 801 et seq.) governs. As the Code read for the years before the Court, those provisions established a three-phase approach for determining a life insurance company's taxable income.[18] Sec. 802(b); see *North Central Life Insurance Co. v. Commissioner,* 92 T.C. 254, 266 (1989). Phase I income is the lesser of: (1) The company's share of investment income or (2) the gain from operations or underwriting income. Sec. 802(b)(1); *North Central Life Insurance Co. v. Commissioner, supra.* The company determines the total investment income and deducts investment expenses to reach investment yield, which is then prorated between the company and the policyholders, determined by the ratio of the company's assets to its reserves. *Commissioner v. Standard Life & Accident Insur-*

---

[18]The Deficit Reduction Act of 1984, *supra,* enacted a new subchapter L and abolished the extraordinarily complex three-phase structure involved in this case. The new subchapter L was designed to simplify the taxation of insurance companies and to create a simpler single-phase tax closer to the general structure of corporate income taxation. See General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 (H.R. 4170, 98th Cong., Pub. L. 98-369, 98 Stat. 494), prepared by the Staff of the Joint Committee on Taxation (Dec. 31, 1984), (hereinafter referred to as the Blue Book), at 577-579.

*ance Co.,* 433 U.S. 148, 155-156 and nn. 13, 14 (1977). The company is taxed only on the company's share of the investment yield and not the policyholders' share. Thus, an increase in reserves reduces the company's taxable investment income since the policyholders' share is dependent on the reserves, whereas an increase in its assets will increase the company's tax since its share is dependent on the assets.

Phase II income is 50 percent of the amount by which the company's gain from operations exceeds its taxable investment income. Sec. 802(b)(2); *North Central Life Insurance Co. v. Commissioner, supra,* 92 T.C. at 267. The other one-half of this excess is taxed as Phase III income, but only when it is actually distributed to, or specially reserved for, the company's shareholders. Sec. 802(b)(3); *North Central Life Insurance Co. v. Commissioner, supra.* A company's "gain from operations" includes the company's share of investment income, the "gross amount of premiums" under section 809(c)(1), decreases in reserves, and net capital gains; also in this Phase II computation increases to reserves are deductible under section 809(d)(2). *Commissioner v. Standard Life & Accident Insurance Co., supra,* 433 U.S. at 156; *North Central Life Insurance Co. v. Commissioner, supra.*

Although premiums are included in a life insurance company's gain from operations, the Code does not specify what is to be done with deferred and uncollected premiums, sometimes referred to as "unpaid premiums." However, the courts, State insurance departments, and the NAIC require that reserves on life insurance policies be computed on the assumption that the net portion (net valuation premium) of deferred and uncollected premiums have been paid a year in advance. *Bankers Union Life Insurance Co. v. Commissioner,* 62 T.C. 661, 672 (1974). This is the "fictional assumption" (of payment or prepayment of the net valuation premium) that the Supreme Court considered at length in *Commissioner v. Standard Life & Accident Insurance Co., supra.* Thus, the insurance company is required to include in each year's reserves the entire net portion (net valuation premium) of the premiums even though it may have received only a part of those premiums. *Midland National*

*Life Insurance Co. v. Commissioner,* 66 T.C. 550, 564 (1976). This results in an overstatement of the reserve liability, but the resulting overstatement of reserves benefits the insurance company since the increase in reserves reduces the company's taxable investment income in Phase I and the increase in reserves is deductible in computing gain from operations in Phase II. The NAIC has specified that since the insurance company is allowed to include the net valuation premium portion of deferred and uncollected premiums in reserves the company must also include gross deferred and uncollected premiums in premium income. The NAIC then allows the insurance company to deduct from gross premium income the annual increase in loading and the cost of collection in excess of loading.

In the present case, both respondent and petitioner rely on the Supreme Court's opinion in *Commissioner v. Standard Life & Accident Insurance Co., supra,* in support of their diametrically opposite arguments as to whether the cost of collection in excess of loading on deferred and uncollected premiums may be deducted from premium income. In that case, the Supreme Court held that only the net portion (net valuation premium) of deferred and uncollected premiums is included in a life insurance company's assets, gross premium income, and reserves, in computing its Federal income tax liability in both the Phase I and Phase II computations. 433 U.S. at 150. That case, however, did not involve any cost of collection in excess of loading and addressed only the two components of a premium: net valuation premium and loading. The parties have not cited and we have not found any case specifically on point on the issue in the present case, so we, like the parties, look to the Supreme Court's *Standard Life & Accident Insurance Co.* opinion for guidance.[19]

---

[19]The parties cite the only three cases where cost of collection in excess of loading is even mentioned. Those three cases are: *Midland National Life Insurance Co. v. Commissioner,* 66 T.C. 550 (1976); *United Life & Accident Insurance Co. v. United States,* 329 F. Supp. 765, at 770 n. 3 (D. N.H. 1971); and *Occidental Life Insurance Co. v. United States,* 70-1 U.S.T.C. par. 9225, 25 AFTR2d 70-796 (C.D. Cal. 1970). The parties disagree as to whether or not the Supreme Court "overruled" those cases in *Commissioner v. Standard Life & Accident Insurance Co.,* 433 U.S. 148 (1977). Those cases involved the dispute as to the treatment of deferred and uncollected premiums, a matter with which this Court and the courts of appeals for the several circuits had long wrestled before the Supreme Court finally resolved the issue in the *Standard Life & Accident Insurance Co.* case. See our opinions in *Bankers Union Life Insurance Co. v. Commissioner,* 62 T.C. 661 (1974), and *Midland National Life Insurance Co. v.*

The Supreme Court in *Commissioner v. Standard Life &
Accident Insurance Co., supra,* first looked to section 818(a),
which governs the method of accounting for life insurance
companies. Section 818(a)[20] provides, in general, that life
insurance companies must report their income and deduc-
tions using the accrual method of accounting. The Supreme
Court determined under section 818(a) that the accounting
procedures established by the NAIC should be followed to
fill the gap if accrual accounting rules are not applicable.
433 U.S. at 162. The Supreme Court then held that rules of
accrual accounting do not apply in this instance to the
fictional assumption of payment of the net valuation
premium, i.e., the fictional assumption that deferred and
uncollected premiums are included in reserves. *Commis-
sioner v. Standard Life & Accident Insurance Co., supra,*
433 U.S. at 162.

In deciding the issue of what portion of deferred and
uncollected premiums to include in reserves, gross premium
income, and assets, the Supreme Court considered and then
rejected three other proposed solutions. The first, argued by
the taxpayer-insurance company, was that the assumption
of prepayment of the deferred and uncollected premiums be
applied when calculating reserves, but ignored when calcu-

---

*Commissioner, supra,* which relate that long and tangled history. However, these earlier cases
are not particularly helpful here, and we confine our analysis to the Supreme Court's opinion.
   [20]Sec. 818(a) (now sec. 811(a)) states:

SEC. 818(a). METHOD OF ACCOUNTING—All computations entering into the determination of the
taxes imposed by this part shall be made—

    (1) under an accrual method of accounting, or
    (2) to the extent permitted under regulations prescribed by the Secretary, under a
combination of an accrual method of accounting with any other method permitted by this
chapter (other than the cash receipts and disbursements method).

Except as provided in the preceding sentence, all such computations shall be made in a
manner consistent with the manner required for purposes of the annual statement approved by
the National Association of Insurance Commissioners.

The Deficit Reduction Act of 1984, *supra,* changed the above flush language to read as
follows:

To the extent not inconsistent with the preceding sentence *or any other provision of this part,*
all such computations shall be made in a manner consistent with the manner required for
purposes of the annual statement approved by the National Association of Insurance
Commissioners. [Emphasis supplied.]

One such new provision was sec. 811(c) to eliminate double counting or double deductions as
to reserves. See Blue Book for the Deficit Reduction Act of 1984, *supra,* at 620-622.

lating assets and income.[21] The Court rejected this as inconsistent since the taxpayer could take a deduction for the deferred and uncollected premiums as reserves but would not have to include those premiums when calculating income. *Commissioner v. Standard Life & Accident Insurance Co., supra,* 433 U.S. at 159-160.

The second solution, argued by the Commissioner, assumed that the entire premium was paid but none of the expenses incurred. In other words, the fictional assumption of prepayment would apply in determining reserves, assets, and gross premium income, but would not apply in determining expenses, i.e., no deduction for loading.[22] The Court rejected this as improperly accelerating the company's tax payments since a major portion of the loading is applied, when received, to deductible expenses. 433 U.S. at 160.

The third approach was to assume that some of the expenses had been incurred and to allow a deduction for some of these expenses.[23] The Supreme Court rejected this approach "Since there is nothing in the statute directing that any portion of unpaid loading be treated as an asset or as income, the statute obviously cannot provide guidance in fashioning a set of deductions to be credited against the fictional assumption that such loading is income." 433 U.S. at 161.

Under the final approach, which the Supreme Court adopted as having "support in the statute," the net valuation premium portion of the unpaid premiums is included in calculating reserves, assets, and gross premium income, while the loading portion of the unpaid premiums is entirely excluded. 433 U.S. at 161-162. The Supreme Court adopted the fictional assumption that the net valuation premium portion of the premium has been paid, but the loading portion has not been paid. The Supreme Court reasoned that since only the net valuation premium portion

---

[21]This was the position adopted below by the Court of Appeals for the Tenth Circuit. 525 F.2d 786 (10th Cir. 1975).

[22]This was the position of the Courts of Appeals for the four circuits that had earlier supported the Commissioner's argument. See *Commissioner v. Standard Life & Accident Insurance Co., supra,* 433 U.S. at 151 n. 4, and our discussion of these circuit opinions in *Bankers Union Life Insurance Co. v. Commissioner, supra,* and *Midland National Life Insurance Co. v. Commissioner, supra.*

[23]This was the position the Tax Court had finally adopted in *Midland National Life Insurance Co. v. Commissioner, supra,* after it had been reversed by the Courts of Appeals for four different circuits.

of the unpaid premiums was included in reserves according to State Insurance Departments and the NAIC, then only the net valuation premium portion should be included in calculating assets under section 805(b)(4) and in calculating gross premium income under section 809(c)(1).[24] 433 U.S. at 162. The Supreme Court stated that including only the net valuation premium portion of deferred and uncollected premiums in these calculations of assets, reserves, and gross premium income would provide symmetry for the taxation of insurance companies and would avoid "the uncertainty and confusion that would attend any attempt to segregate unpaid loading into deductible and nondeductible parts." 433 U.S. at 162.

The Supreme Court did not discuss what should be done with the cost of collection in excess of loading. Petitioner says that the "logical consequence" of the Supreme Court's holding in the *Standard Life & Accident Insurance Co.* case is that cost of collection in excess of loading must be treated the same as loading and that both are deductible from gross premium income.

Petitioner argues that the NAIC guidelines must be followed since the Supreme Court in that case stated that under section 818(a) since accrual accounting does not apply to the fictional assumption of receipt of deferred and uncollected premiums the NAIC guidelines must be followed. In that case, the Supreme Court did follow the NAIC guidelines, but only to a point. The Supreme Court did not adopt the specification of the NAIC that gross deferred and uncollected premiums be included in premium income and then the increase in loading and the cost of collection in excess of loading be deducted from premium income. The Supreme Court did not mention any cost of collection in excess of loading but instead emphasized that since the insurance company could include the net portion (net valuation premium) of deferred and uncollected premiums in reserves, to the benefit of the company, that company would also have to include that same amount in assets and gross premiums. In addition, the Supreme Court specifically rejected the practice of deducting certain expenses from

---

[24]The Supreme Court noted that this position "was regarded as the correct approach by the Tax Court when it first confronted this problem area." 433 U.S. at 162.

deferred and uncollected premiums when calculating gross premium income and assets. The Supreme Court wanted to obviate the need for other courts to wrestle with which portions of the unpaid loading could be deducted and which could not. The Supreme Court set forth the rule that only the net valuation premium portion of deferred and uncollected premiums (unpaid premiums) would be included in gross premium income and assets. Thus loading is effectively excluded.

We recognize that, by using only the net valuation premium to calculate gross income from premiums, the Supreme Court's approach may be viewed as essentially the same as including the gross deferred and uncollected premiums in income and then allowing a deduction for loading, which is what the NAIC permits on the annual statements. Respondent seems to acknowlege that that is the practical result as to loading. Respondent points out that the deficiency notice did not adjust petitioner's method of reporting unpaid premiums and that "By including the gross unpaid premiums in income and then deducting the loading portion * * * , petitioner has *effectively* complied with the holding in *Standard Life.*" (Emphasis added.) Petitioner argues that the Supreme Court in the *Standard Life & Accident Insurance Co.* case "held that the increase in loading was a proper reduction of premium income but did not need in that case to consider whether the increase in the cost of collection in excess of loading should also reduce premium income." Petitioner says the NAIC annual statement treats the increase in cost of collection in excess of loading "in exactly the same manner as the increase in loading" and from that concludes that the "logical consequence" of the Supreme Court's holding is to reduce premium income by cost of collection in excess of loading as well as by loading. We disagree. While loading may be effectively excluded under the Supreme Court's ruling, that is not the same as saying that loading is deductible for Federal tax purposes, let alone that cost of collection in excess of loading is deductible.

Before further discussing petitioner's efforts to extend the Supreme Court's holding to cover "cost of collection in excess of loading," some definitions of terms should be

repeated. The "gross premium" is what the insurance company charges its policyholder. The gross premium normally includes two components: (1) "Net valuation premium," the amount the State requires the insurance company to add to its reserves and (2) "loading," an amount to cover expenses (other than benefit claims) and any profit. Thus, normally any part of the gross premium in excess of the net valuation premium is loading, and loading is to cover expenses and profit. However, loading may not include any profit and may not be sufficient to cover expenses. In other words, since the net valuation premium is determined by the State on conservative actuarial assumptions and since the gross premium charged to the policyholder is determined by the company and may be determined by the company on the basis of what it regards as more realistic actuarial assumptions, the gross premium charged to the policyholder may, in fact, be close to or perhaps even less than net valuation premium.[25] In that event, the gross premium includes little or no loading or at least insufficient loading to cover expenses. If there is no loading or insufficient loading, there arises "cost of collection in excess of loading."[26]

While the Supreme Court expressed its deference to the NAIC accounting rules, the Court very firmly emphasized the need for overall symmetry when it determined that only

[25] If the gross premium charged to the policyholder is less than the net valuation premium, then the gross premium is inadequate to cover the statutory reserve amount and the insurance company sets up a deficiency reserve to cover the shortage. See *supra* notes 6, 7. Reserves, both statutory and deficiency, are bookkeeping entries reflecting liabilities on the insurance company's books and do not represent funds actually set aside in something like a trust fund. See S. Huebner and K. Black, Life Insurance 350-367 (10th ed. 1982); and D. McGill & R. Irwin, Life Insurance 218-245 (1967). It is the company's surplus that actually protects the policyholders. See *Southwestern Life Insurance Co. v. United States,* 9 Cl. Ct. 102 (1985).

However, these bookkeeping entries, i.e., these liabilities for "statutory reserves" and for "deficiency reserves," have significance in the insurance industry and for Federal tax purposes. Increases to statutory reserves reduce taxable investment income in the computation or Phase I income and are deductible in computing Phase II income from operations.

[26] In the present case there is no dispute as to the correctness of the figures for cost of collection in excess of loading. Therefore, this case does not present any possible abuse of hidden nondeductible profit in loading that an insurance company might try to deduct as "loading" in the Phase II calculations. In regard to the ART-B policies that created the cost of collection in excess of loading in this case, the agent's commission on such policies was 100 percent of the first year's premium. Thus, there was certainly no hidden profit for the first year and in a sense no net valuation premium amount (reserve amount) either. Presumably a deficiency reserve was set up. Of course, the agent's commission does not accrue until the premium has actually been collected, but here the commissions (100 percent of first year premiums) were advanced to the agents in about 90 percent of the policies sold.

the net portion of deferred and uncollected premiums would be used to calculate assets, reserves, and gross premiums. That was as far as the Supreme Court was willing to extend the fictional assumption of prepayment. The Supreme Court's excluding loading, i.e., declining to extend the fictional assumption of prepayment to loading, did not mean loading was deductible for Federal tax purposes. Indeed "loading" in its usual sense might include an element of profit which would never be deductible even when actually received by the insurance company. The Tax Court recognized in *Midland National Life Insurance Co. v. Commissioner, supra,* that loading is not a deductible item. We pointed out (66 T.C. at 565-566) that:

Loading is a technical term which denotes the difference between the net premium, which is computed under State-mandated conservative interest and mortality assumptions, and the gross premium, which is computed independently of the net premium utilizing different interest and mortality assumptions. Thus, "loading" in its technical sense is neither an identifiable expense nor an agglomeration of expenses. Indeed, if gross premiums as calculated by the company exceed the net premiums, the difference may be attributable to the profit margin or other elements, which are not deductible. See *North American Life & Casualty Co.,* 63 T.C. at 374-375.

A fortiori any anticipated cost of collection in excess of loading cannot be converted into a currently deductible item.

Any anticipated cost of collection in excess of loading is either an amount not included at all in the gross premium charged to the policyholder or if it is considered as part of the gross premium it can only come out of the net valuation premium, i.e, out of the reserves required by State law. See also notes 6, 7, and 26, *supra.* Since the addition to reserves is already deducted as such, what petitioner seeks appears to be a double deduction for the same amount of unpaid premium. Since the Supreme Court refused to extend the fictional assumption of payment to loading, a fortiori there cannot be a fictional assumption of payment of anticipated cost of collection in excess of loading.[27]

---

[27]While the Deficit Reduction Act of 1984, *supra,* reversed the holding of the Supreme Court in *Commissioner v. Standard Life & Accident Co.,* 433 U.S. 148 (1977), it did so as to the fictional assumption of payment of even the net valuation premium, making it clear that accounting methods required for State regulatory purposes apply *only* to the extent that they

Accordingly, we conclude that petitioner may not deduct the cost of collection in excess of loading from deferred and uncollected premiums when determining its gross premium income. In other words, petitioner may not reduce its gross premium income by the cost of collection in excess of loading.

## III

### *Gross Premiums From Entering Modified Coinsurance Agreement*

The third issue is whether, upon entering into a modified coinsurance agreement, petitioner must include as premium income the deficiency reserve that it is deemed to have received. Petitioner argues that when it entered into the modified coinsurance agreement with Occidental, petitioner had no gain or loss, except for the expense of the ceding commission of $146,297 it paid Occidental. Petitioner contends that although Occidental was deemed to have transferred to petitioner a statutory reserve of $11,703,744 and a deficiency reserve of $1,852,244, less a ceding commission of $146,297, at the same time petitioner was deemed to have returned $13,555,988 to Occidental. Petitioner contends that the transaction should result in no economic gain or loss, other than the ceding commission, since petitioner returned

---

are not inconsistent with Federal tax accounting rules and reinforcing the primacy of the Federal tax rules. See note 20, *supra.* In explaining the new sec. 811 accounting provisions, the Deficit Reduction Act of 1984 Blue Book, *supra* at 621-622 stated that:

Although the Act continues to provide a general prohibition against any double deduction of an item, it also adopts a new rule that disallows a reserve for any item unless the gross amount of premiums and other consideration attributable to such item are required to be included in gross income. Thus, because deferred and uncollected premiums for a contract do not accrue until paid, the contractual liability related to those premiums may not be recognized until the premiums are taken into income. This provision of the Act, in effect, reverses the holding of the Supreme Court in *Commissioner v. Standard Life & Accident Insurance Co.,* 433 U.S. 148 (1977), by statutorily requiring a matching of the reserve deduction with the related income item.

The new sec. 811(c) now provides that:

SEC. 811(c). No DOUBLE COUNTING.—Nothing in this part shall permit—

(1) a reserve to be established for any item unless the gross amount of premiums and other consideration attributable to such item are required to be included in life insurance gross income,

(2) the same item to be counted more than once for reserve purposes, or

(3) any item to be deducted (either directly or as an increase in reserves) more than once.

Our holding here is wholly consistent with those prospective legislative changes, but is not in any way dependent on such legislative changes.

all of the reserves to Occidental. Since deficiency reserves do not qualify as "life insurance reserves" under section 801(b)(4) and section 801(c), and hence are not deductible, petitioner argues that only statutory reserves, and not the $1,852,244 in deficiency reserves, should be included as income under section 809(c)(1). In the alternative, petitioner contends that if the deficiency reserve is included in gross premium income, petitioner is entitled to treat the $1,852,244 deficiency reserves as "return premiums" or "premiums and other consideration arising out of reinsurance ceded" under section 809(c)(1) so as to reduce the gross amount of premiums by that amount.

Respondent contends that under section 809(c)(1) a reinsuring company (reinsurer) must include in premium income an amount equal to all of the reserve liability transferred to it (both statutory and deficiency) and then may only deduct statutory, as opposed to deficiency, reserves. Thus, respondent contends that petitioner must recognize income to the extent of the deficiency reserve that it is deemed to have received. As to petitioner's argument that the deficiency reserves can be deducted under section 809(c)(1) as return premiums or premiums and other consideration arising out of reinsurance ceded, respondent disagrees, apparently analogizing deficiency reserves to ceding commissions that were once thought to be return premiums.

There are two types of reinsurance transactions, assumption reinsurance and indemnity reinsurance.[28] In an assumption reinsurance agreement, one insurance company, the ceding company, transfers some of its policies to the reinsuring company, which assumes the statutory reserves liability on the policies, is entitled to all premiums, and becomes directly liable to the policyholders. *Beneficial Life Insurance Co. v. Commissioner*, 79 T.C. 627, 636 (1982). The second type of reinsurance is indemnity (or coinsurance) reinsurance of which there are two types, conventional and modified coinsurance. In a conventional coinsurance agreement, the ceding company transfers to the reinsuring

---

[28]The Supreme Court's recent opinion in *Colonial American Life Insurance Co. v. Commissioner*, 491 U.S. ____ (1989), affg. 843 F.2d 201 (5th Cir. 1988), revg. T.C. Memo. 1986-226, seems to blur the distinctions between assumption and indemnity reinsurance, at least in the matter of ceding commissions. However, these distinctions no doubt retain vitality for other insurance and tax law purposes.

company (reinsurer) all or part of its liability on the policies being reinsured, with the reinsuring company setting up a reserve to cover the risks acquired. The ceding company remains directly liable to the policyholders, collects premiums, and pays claims and expenses. The reinsuring company receives an agreed reinsuring premium from the ceding company and must reimburse the ceding company for the portion of claims and expenses attributable to the risks reinsured. *Beneficial Life Insurance Co. v. Commissioner, supra,* 79 T.C. at 643.

In a modified coinsurance agreement, the assets and the reserves on the insurance remain with the ceding company, while the reinsurer pays the ceding company an up-front fee, or ceding commission, and agrees to indemnify the ceding company for a specified percentage of the claims and expenses attributable to the risks that have been reinsured and the reinsurer receives a like-percentage of the premiums generated by those risks. Sec. 820(b). The ceding company remains directly liable to its policyholders and continues to pay claims and collect premiums, and the ceding company (reinsured) retains ownership of the assets in relation to the reserve on the policy reinsured. Sec. 820(b). Parties to a modified coinsurance agreement, however, may elect to be treated, for Federal tax purposes, as reinsured under a conventional coinsurance agreement. When that election is made, for Federal tax purposes, the ceding company retains the assets and reserves, but the assets and reserves are treated as being held on behalf of the reinsuring company. In other words, the reserves are treated as part of the reserves of the reinsurer, and the assets in relation to such reserve are treated as owned by the reinsurer. Sec. 820(c)(3). Thus, under a section 820(a)(1) election, both types of indemnity reinsurance, conventional and modified, are treated the same with a shift of reserves from the ceding company (reinsured) to the reinsuring company (reinsurer) taking place or treated as taking place. *Beneficial Life Insurance Co. v. Commissioner, supra.*

In determining a life insurance company's taxable income, the company's gain from operations includes gross premium income. Section 809(c)(1) states that the following items shall be taken into account:

(1) PREMIUMS.—The gross amount of premiums and other consideration (including advance premiums, deposits, fees, assessments, and consideration in respect of assuming liabilities under contracts not issued by the taxpayer) on insurance and annuity contracts (including contracts supplementary thereto); less return premiums, and premiums and other consideration arising out of reinsurance ceded. Except in the case of amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded, amounts returned where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management shall not be included in return premiums.

Under section 809(c)(1) the phrase in the first parenthetical, "consideration in respect of assuming liabilities under contracts not issued by the taxpayer * * * ," means that the reinsuring company in either an assumption or an indemnity reinsurance agreement must include in gross premiums any consideration it receives. *Beneficial Life Insurance Co. v. Commissioner, supra,* 79 T.C. at 644-645; *Kentucky Central Life Insurance Co. v. Commissioner,* 57 T.C. 482, 495 (1972). Section 820(c)(3) requires that the reinsuring party of a modified coinsurance agreement (electing to be treated as a conventional coinsurance agreement) also must include any consideration it is deemed to receive from the ceding company, i.e., both reserves and assets for the reinsured policies are treated as owned by the reinsurer and not by the reinsured. Because in such an arm's-length transaction the exchanges by each party are deemed to be equal, the consideration received is normally considered to be equal to the full amount of the reserve liability assumed. *Oxford Life Insurance Co. v. United States,* 790 F.2d 1370, 1374 (9th Cir. 1986); *Beneficial Life Insurance Co. v. Commissioner, supra.* We note, however, that these two cases involved only statutory reserves.

After the reinsuring party of an assumption or conventional reinsurance agreement has included the consideration received by it as premium income under section 809(c)(1), that party is then entitled to take a deduction under section 809(d)(2) from this premium income for the net increase in its "life insurance reserves." Section 820(c)(3) allows the reinsuring party of a modified coinsurance agreement (electing to be treated as a conventional coinsurance agreement) to deduct the net increase in its life insurance reserves.

However, the term "life insurance reserves" includes only statutory reserves and does not include deficiency reserves. Sec. 801(b)(4) and (c).

State laws and regulations require that an insurance company maintain a reserve, which is computed on the basis of recognized mortality tables and assumed rates of interest and is set aside to liquidate future unaccrued claims arising from life insurance contracts. *Mutual Benefit Life Insurance Co. v. Commissioner*, 488 F.2d 1101, 1107 (3d Cir. 1974), affg. 58 T.C. 679 (1972). The amount set aside for the reserve is generally the net valuation premium. However, if the gross premium charged by a life insurance company for a particular class of policies is less than the net valuation premium for the reserves, the company is required by State law to maintain a deficiency reserve so that reserves will equal net valuation premiums. S. Huebner and K. Black, Life Insurance 364-365 (10th ed. 1982). Historically, a net valuation premium on a policy has been considerably less than the gross premium. In recent years, due to continued improvement in mortality and increasing price competition, gross premium levels have been brought down to levels approaching or even below net valuation premiums, which are computed on rigid formulas imposed by the State that often do not vary even though life expectancies are increasing. *Mutual Benefit Life Insurance Co. v. Commissioner, supra*, 488 F.2d at 1108.

Section 809(c)(1) does allow a further deduction from gross premium income for "return premiums" and "premiums and other consideration arising out of reinsurance ceded." Return premiums are "amounts returned or credited which are fixed by contract and do not depend on the experience of the company or the discretion of the management." Sec. 1.809-4(a)(1)(ii), Income Tax Regs. Prior to the Supreme Court's opinion in *Colonial American Life Insurance Co. v. Commissioner*, 491 U.S. __ (1989), the Tax Court had held that in an indemnity reinsurance transaction ceding commissions may be deducted by the reinsuring company as return premiums under section 809(c)(1). *Beneficial Life Insurance Co. v. Commissioner, supra*, 79 T.C. at 646. In *Colonial American Life Insurance Co. v. Commissioner, supra*, the Supreme Court rejected that approach and

held that ceding commissions under a contract for indemnity reinsurance are not return premiums but represent instead an investment in a future income stream that extends substantially beyond the taxable year of the agreement and therefore must be capitalized and amortized over the anticipated life of the agreement.

In *Colonial American Life Insurance Co. v. Commissioner, supra,* the reinsuring company further argued that it should be permitted to deduct ceding commissions from gross premiums under section 809(c)(1), as "premiums and other consideration arising out of reinsurance ceded." The Supreme Court held that this language in section 809(c)(1) did not cover ceding commissions, noting that a plausible reading of the language was that it instead referred "only to payments from the ceding company to the reinsurer, as, for example, when the ceding company is simply passing on premiums it has received from a policyholder but is obligated to deliver to a reinsurer under an indemnity-reinsurance agreement." The Supreme Court concluded that this section 809(c)(1) language provides "a general definition of premium income, which it then fine-tunes in the latter part of the section by excluding certain items that might otherwise be considered to come within the general definition." This fine-tuning mechanism in section 809(c)(1), the Supreme Court said, merely permitted "the exclusion from premium income of phantom premiums that might be encompassed within a strict definition of premiums but that in fact never really accrued to the company that nominally receives them" and thus did not include ceding commissions. Instead, the Supreme Court found that ceding commissions for both assumption and indemnity reinsurance are costs incurred to acquire an asset with an income-producing life that may extend substantially beyond 1 year and so must be capitalized and amortized over the useful life of the asset. In the *Colonial American Life Insurance Co.* case, in what the Supreme Court described as "a battle of analogies," the reinsurer was trying to analogize the ceding commissions to agents' commissions paid by a direct insurer, and trying to use section 809(c)(1) to create a deduction. The Supreme Court said that the reinsurer in effect asked the Court "to conclude that Congress sub-

sumed a major deduction within the fine details of its definition of premium income." The Supreme Court rejected that idea, finding it "incredible that Congress, with but a whisper, would have tucked away in the fine points of its definition of premium income a deduction of this magnitude."

Here, under the Supreme Court's *Colonial American Life Insurance Co.* opinion, petitioner has improperly reduced its amount of premium income by the ceding commission it transferred to Occidental, but respondent has not contested this treatment of the ceding commission in this case. Thus, this ceding commission issue is not before us. We must consider what impact, if any, the Supreme Court's interpretation of section 809(c)(1) has on the parties' arguments.

Before reaching the argument as to whether the gross amount of premiums under section 809(c)(1) can be reduced by the amount of deficiency reserves, we first consider whether the amount of deficiency reserves should be considered part of the gross amount of premiums in the first place. Many of the parties' stipulations of fact and their arguments on brief are devoted to the mechanics of the modified coinsurance agreement. While we adopt the parties' stipulations as to the mechanics of these deemed transfers, that does not, as respondent seems to argue, determine the legal effect. There was an election under section 820(a)(1) here and therefore under section 820(c) the modified coinsurance agreement is treated, for Federal tax purposes, like a conventional coinsurance agreement. Respondent seems to think the parties' stipulations settle the legal question as to what "consideration" or gross amount of premiums and other consideration petitioner received.

In the earlier cases involving statutory reserves *only,* the courts held that because in an arm's-length transaction the exchanges between the parties are deemed to be equal (*Commissioner v. Davis,* 370 U.S. 65 (1962)), the consideration received is deemed to be equal to the full amount of the reserve liability assumed by the reinsuring company (reinsurer). *Prairie States Life Insurance Co. v. United States,* 828 F.2d 1222, 1230-1231 (8th Cir. 1987); *Oxford Life Insurance Co. v. United States, supra,* 790 F.2d at 1374; *Beneficial Life Insurance Co. v. Commissioner, supra,*

79 T.C. at 644-645; *Kentucky Central Life Insurance Co. v. Commissioner, supra.* In these cases the transfers or deemed transfers of assets and reserves were washes, because the full amount of the statutory reserve liability could be deducted as an increase to the reinsurer's own "life insurance reserves." Here, since deficiency reserves do not qualify as "life insurance reserves" and hence are not deductible by the reinsurer, the question arises for the first time as to whether these deficiency reserves constitute consideration received by the reinsurer. Petitioner complains that respondent is trying to create "phantom income" out of these deficiency reserves.

As explained by S. Huebner & K. Black, Life Insurance, *supra,* at 364-365:

Deficiency-reserve laws are founded on the fact that the use, in the prospective reserve formula, of a valuation net level premium larger than the gross premium that will actually be received overstates the present value of future premiums and, consequently, understates the amount of the reserve. The deficiency is represented by the present value of the excess of the valuation net premium over the gross annual premium. In contrast to the regular policy reserves, which increase with duration, deficiency reserves for a given class of policies decrease over time, disappearing altogether at the end of the premium-paying period.

See also *Mutual Benefit Life Insurance Co. v. Commissioner, supra,* 488 F.2d at 1106-1107. As defined by section 801(b)(4), the deficiency reserve for any contract is:

that portion of the reserve for such contract equal to the amount (if any) by which—

(A) the present value of the future net premiums required for such contract, exceeds

(B) the present value of the *future actual premiums and consideration charged for such contract.* [Emphasis supplied.]

Thus, deficiency reserves, unlike statutory reserves, will decrease and vanish over the life of the policy. More importantly, deficiency reserves are something in excess of and not part of the "actual premiums and consideration charged for such contract." In other words, the deficiency reserve is not part of what the insurance company will actually receive from the policyholder. The gross premium is what the insurance company will actually receive from the policyholder when all of the premiums are paid. We do not

see how the insurance company can be said to have a gross amount of premiums (premium income) in excess of that gross premium, whether we are looking at an original insurer, a ceding company (reinsured), or a reinsuring company (reinsurer). Thus we think petitioner is correct that the deficiency reserves are not part of the consideration it received in this indemnity reinsurance arrangement and are not part of "the gross amount of premiums and other consideration (including * * * consideration in respect of assuming liability under contracts not issued by the tax-payer)" under section 809(c)(1).

However, if as the Supreme Court phrased it the deficiency reserve "might otherwise be considered to come within the general definition" or is technically considered part of "the gross amount of premiums and other consideration (including * * * consideration in respect of assuming liability under contracts not issued by the taxpayer)," then we think this deficiency reserve amount would serve to reduce that figure under the Supreme Court's interpretation of section 809(c)(1) in *Colonial American Life Insurance Co. v. Commissioner, supra.* Here petitioner argues that the deficiency reserve is deductible as either "return premiums" or "premiums and other consideration arising out of reinsurance ceded."

Subchapter L of the Internal Revenue Code was designed to make insurance companies more clearly reflect the income they generate from their unique method of operations. *Kentucky Central Life Insurance Co. v. Commissioner, supra,* 57 T.C. at 498. In addition, generally the value of properties exchanged in an arm's-length transaction is presumed to be equal. *Oxford Life Insurance Co. v. United States, supra.* Previously, the courts have taken great care to ensure that a reinsurer does not attempt to deduct an artificial loss when a reinsurance transfer is made. See, e.g., *Kentucky Central Life Insurance Co. v. Commissioner, supra.* In this case, respondent argues that petitioner has a gain despite the fact that petitioner was treated as transferring back all of the assets and reserves that it initially received. In other words, due to the fact that a deficiency reserve may not be deducted under section

809(d)(2), rather than the usual wash there is instead an artificial or phantom gain.

As indicated above, we think this artificial or phantom gain does not come within the basic definition of the gross amount of premiums and other consideration, i.e., does not come within the general definition of premium income set out by section 809(c)(1). But if it, like return premiums or other such phantom premiums, is so included in a technical sense, then we think that the deficiency reserve constitutes "premiums and other consideration arising out of reinsurance ceded * * * " so as to reduce gross premiums under section 809(c)(1). Thus, the "consideration in respect of assuming liabilities under contracts not issued by the taxpayer" or the reserves petitioner initially was treated as receiving from Occidental may be reduced by the deficiency reserve. We reach this conclusion based on the Supreme Court's analysis in *Colonial American Life Insurance Co. v. Commissioner, supra,* which stated that consideration arising out of reinsurance ceded might include "phantom premiums that might be encompassed within a strict definition of premiums but that in fact never really accrued to the company that nominally receives them * * * ." With respect to the indemnity reinsurance agreement in this case, if a deficiency reserve is otherwise considered to come within the general definition of premium income when the reinsuring party receives the reserve under section 809(c)(1), then the deficiency reserve should be treated as nothing more than a phantom premium or other consideration arising out of reinsurance ceded which then reduces premium income under section 809(c)(1). In reaching this conclusion we think that Congress only intended to tax the reinsuring party of a reinsurance contract on those amounts that the party collected under the contract once the contract was in effect and not the deficiency reserves that the ceding company was required to maintain under State law.

In summary, a deficiency reserve does not qualify as a life insurance reserve and it is not part of the gross premium the insurance company will ultimately receive from the policyholder. Therefore, a deficiency reserve should not be deemed part of the gross amount of premiums. If a

deficiency reserve is technically part of the premium income, then it is the type of "phantom" premium that the reinsurer will never really receive, and therefore the gross amount of premiums may be reduced by the deficiency reserve amount when the reinsurer includes the consideration it received from the ceding company in gross premiums under section 809(c)(1).

## IV

### *Spouses' Attendance at Sales Conferences*

Petitioner seeks to deduct expenses attributable to the attendance of the spouses of its agents and employees at various sales conferences. In the alternative, petitioner contends that even if it had no business purpose for inviting the spouses to attend the conferences, the spouses' expenses are deductible as additional compensation to the home office employees and insurance agents. Respondent contends that the costs attributable to the spouses are not deductible under section 162 because they are not ordinary and necessary business expenses. In addition, respondent objects to petitioner's argument that the spouses' expenses are deductible as compensation since petitioner raised this issue for the first time in its post-trial briefs.

Section 162(a) allows as a deduction ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Whether an expense is ordinary and necessary is a question of fact. *Commissioner v. Heininger*, 320 U.S. 467, 475 (1943); *Walliser v. Commissioner*, 72 T.C. 433, 437 (1979). Each case turns on its own particular facts. *Commissioner v. Heininger, supra*, 320 U.S. at 473.

Section 1.162-2(c), Income Tax Regs., provides that when a spouse is included on a business trip, the spouse's expenses are not deductible unless the spouse's presence serves a bona fide business purpose.[29] The spouse must

---

[29]Petitioner argues that this regulation applies only to individual taxpayers who want to deduct their spouses' expenses, and not to corporations that pay those expenses and then try to deduct them. The regulation itself does not indicate that it is applicable only to individual taxpayers, and the courts have applied this regulation to corporations attempting to deduct expenses of their employees' spouses. See *Meridian Wood Products Co. v. United States*, 725 F.2d 1183, 1190 (9th Cir. 1984); *United Title Insurance Co. v. Commissioner*, T.C. Memo. 1988-38. Thus, we reject petitioner's narrow reading of this regulation.

provide substantial services directly and primarily related to the business. *Weatherford v. United States,* 418 F.2d 895, 897 (9th Cir. 1969). The performance by a spouse of some incidental service, such as greeting or socializing, does not cause the spouse's expenses to qualify as a deductible business expense. In addition, serving as a host or hostess is ordinarily not enough to constitute a bona fide business purpose. *Meridian Wood Products Co. v. United States,* 725 F.2d 1183, 1190-1191 (9th Cir. 1984); *Weatherford v. United States, supra,* 418 F.2d at 897.

With regard to insurance companies, in *Peoples Life Insurance Co. v. United States,* 179 Ct. Cl. 318, 326, 373 F.2d 924, 928 (1967), the court allowed the deduction of the spouses' expenses. The court noted the importance the insurance company-taxpayer attached to the spouses of agents throughout the year. When an agent was hired, the taxpayer specifically directed certain training and educational materials to the spouse. Parts of the convention programs were specifically addressed to the spouses, and several of the spouses prepared and delivered speeches. On the other hand, in *Acacia Mutual Life Insurance Co. v. United States,* 272 F. Supp. 188, 199-200 (D. Md. 1967), the court held that the expenses for spouses of insurance agents were not deductible as business expenses since little effort was made to plan business sessions directed to these spouses, and the spouses were free to pursue recreational activities throughout the trip. With regard to spouses of home office personnel, these deductions were allowed in that case as business expenses since the spouses were assigned to specific duties at the meetings that left them little time for recreational activities during the day.

On the record in this case, we have found as a fact that neither the spouses of the home office employees nor the spouses of the insurance agents served a bona fide business purpose at the sales conferences. That the spouses of the home office employees greeted the insurance agents and their spouses and that they hosted informal dinner parties when formal dinners were not scheduled are not sufficient duties to constitute a business purpose. These were merely incidental services. Unlike the taxpayer in *Acacia Mutual Life Insurance Co. v. United States, supra,* 272 F. Supp. at

199-200, petitioner offered no evidence of any specific duties assigned to these spouses during the meetings after the guests had been greeted.

With regard to the spouses of the insurance agents, petitioner argues that these spouses contributed to the independent agents' work of selling insurance products and so it was to petitioner's advantage to discuss promoting petitioner's products with both the agent and the spouse. The factual record in this case does not support that argument. Unlike the taxpayer in *Peoples Life Insurance Co. v. United States, supra*, 373 F.2d at 928, petitioner offered no evidence to establish that it focused in on spouses who contributed to the agents' insurance business. Petitioner invited the spouses of all of the agents, regardless of whether those spouses aided or worked alongside the agents or not. In addition, petitioner offered no competent or probative evidence to show that any of the business meetings were specifically addressed to the spouses. Thus, on this record we hold that petitioner may not deduct the expenses attributable to the spouses of either the home office employees or the insurance agents as bona fide business expenses.

Petitioner contends that even if the expenses are not bona fide business expenses, petitioner may still deduct the spouses' expenses as additional compensation to the home office employees and insurance agents. We agree with respondent that this argument is untimely raised, but in any event petitioner has failed to carry its burden of proof.

To be deductible as compensation, the amount must be "for personal services actually rendered" and must be reasonable in amount. Sec. 1.162-7(a), Income Tax Regs.; *Elliotts, Inc. v. Commissioner*, 716 F.2d 1241, 1243-1245 (9th Cir. 1983), revg. a Memorandum Opinion of this Court. Spouses' expenses may be deductible as additional compensation to the employees if the compensation does not exceed the bounds of reasonableness.[30] Petitioner offered no evidence with regard to this issue of reasonableness. There is also no indication that the employees or agents were ever informed that they were receiving additional compensation

---

[30]*Bank of Stockton v. Commissioner*, T.C. Memo. 1977-24.

in the form of payment of their spouses' expenses. Petitioner has failed to sustain its burden of proof.

To reflect the concessions and the above holdings,

*Decision will be entered under Rule 155.*